**SWIFT & COMPANY, National Biscuit Company, and The Great Atlantic & Pacific Tea Company, Appellants and Cross-Appellees,**

v.

**UNITED STATES of America, Appellee and Cross-Appellant.**

No. 7579.

United States Court of Appeals Fourth Circuit.

Reargued April 25, 1958.

Decided June 12, 1958.

Certiorari Denied Oct. 13, 1958.

See 79 S.Ct. 60.

---

4. 42 U.S.C.A. § 405(g).

5. Forenz v. Folsom, 3 Cir., 1956, 237 F.2d 46, certiorari denied 1957, 352 U.S. 1006, 77 S.Ct. 569, 1 L.Ed.2d 551.

6. Note 5, supra.

7. 3 Cir., 1957, 246 F.2d 776, 781.

David R. Owen, Baltimore, Md. (Semmes, Bowen & Semmes, Baltimore, Md., on the brief), for appellant and cross-appellee, Swift & Co.

William L. Marbury and John Martin Jones, Jr., Baltimore, Md. (William E. MacKay, Walter S. Halliday, Jr., and Fred E. Campbell, New York City, on the brief), for National Biscuit Co. and the Great Atlantic & Pacific Tea Co., appellants and cross-appellees.

George Cochran Doub, Asst. Atty. Gen., and Marvin C. Taylor, Sp. Litigation Counsel, Dept. of Justice, Washington, D. C. (Leon H. A. Pierson, U. S. Atty., Baltimore, Md., on the brief), for United States, appellee and cross-appellant.

M. R. Garstang, Washington, D. C., for National Milk Producers Federation, amicus curiae.

Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

SOPER, Circuit Judge.

The United States in these suits seeks to recover substantial sums of money paid by the Department of Agriculture, acting through the Commodity Credit Corporation, to Swift & Company, National Biscuit Company and the Great Atlantic and Pacific Tea Company under a program for price support of milk, butterfats and the products of such com-

modities in March and April, 1954. In all, payments amounting to approximately $2 million were made to 132 corporations. The payments were made and accepted in good faith in the belief of the parties that the Secretary was acting in accordance with the Agricultural Act of October 31, 1949, 63 Stat. 1051, 7 U.S.C.A. § 1421 et seq., and particularly with § 201, 7 U.S.C.A. § 1446(c), which establishes price support levels for dairy products in the following terms:

"(c) The price of whole milk, butterfat, and the products of such commodities, respectively, shall be supported at such level not in excess of 90 per centum nor less than 75 per centum of the parity price therefor as the Secretary determines necessary in order to assure an adequate supply. Such price support shall be provided through loans on, or purchases of, milk and the products of milk and butterfat."

The crucial question is whether the transactions involved constituted purchases of the products of milk and butterfat. The Secretary concluded that the transactions were purchases within the meaning of the statute, but subsequently they were examined by the Fountain Committee, a subcommittee of the House Committee on Government Operations, 84th Congress, 2nd Session, and an opinion was sought from the Comptroller of the United States. He ruled that the transactions were not purchases and that the payments were unauthorized and improper. Accordingly the present suits were instituted. The District Judge reached the same conclusion and entered judgments for the United States against Swift & Company in the sum of $28,373.84; against National Biscuit Company for $108,693.78; and against the Great Atlantic and Pacific Tea Company for $109,572.55. The defendants have appealed from these judgments. The District Judge refused to add interest to the amounts which he found to be owing by the defendants and the United States has filed a cross-appeal from this ruling.

The transactions took place in March and April, 1954, but they will be better understood from a consideration of the following outline of prior transactions, undertaken by the Secretary of Agriculture to carry out the provisions of the Act, which were designed to afford price support to the producers of various agricultural commodities including milk and butterfat and the products thereof. During the course of the years two distinctive methods for increasing the income of dairy farmers have been evolved. One of these programs is designed to increase the market price of the supported commodity by limiting the supply. Under this method the Government makes a standing offer to purchase, and actually purchases, all quantities of the commodity offered at a pre-determined support price, and thereby so much of the supply as cannot be sold at the desired price level will be removed from the open market and the price level will be maintained.

The other method lets the market price fall through the sale of an unrestricted supply of farming commodities but assures a reasonable return to the farmer by giving him a direct subsidy payment. The amount of the payment is determined by calculating the difference between the free market price he receives for his products and the price the Department of Agriculture determines he should receive so as to enable him to earn a profit. The basic economic difference between the two programs is that the former is designed to keep the market price up to the desired level through Government acquisition, while the latter lets the market seek its own level and supplements the farmer's income by direct payments.

Both of these methods have been tried under the authority of acts of Congress. The Agricultural Adjustment Act of 1938, 52 Stat. 31, 43, provided limited guarantees of prices ranging from 52 to 75 per cent of parity with those prevailing in the base period between 1910 and 1914. The Commodity Credit Corporation was the agency through which financial assistance was extended. The

Steagall Amendment to the statute, passed in 1941, 15 U.S.C.A. § 713a–8(a), authorized the Secretary of Agriculture to support the price of nonbasic agricultural commodities such as milk at 85 per cent and later at 90 per cent of parity "through a commodity loan, purchase, or other operation"; and a program was set up which provided for the purchase by CCC of cheese at one price without physical delivery and the immediate resale at a lower price. During the Second World War both direct payment and sale-and-resale at a loss programs were used in aid of the farming industry. The effect of these programs was to furnish an abnormally low market price to consumers; but when the programs were first restricted and finally abolished by Congress near the end of the war and prices consequently rose, resentment against the farmers was aroused and substantial harm to the market for dairy products ensued. It was under these circumstances that Congress passed the Agricultural Act of 1948 (62 Stat. 1247). It provided in Title I a temporary program under which the Secretary was directed to support the price of agricultural commodities, including dairy products, by means of "loans, purchases, or other operations." This was to continue until December 31, 1949, when a permanent farm program, set up by Title II, was to become effective. Therein price support was authorized by "loans, purchases, payments, and other operations."

In the meantime, Secretary of Agriculture Brannan, who was then in office, proposed a plan which involved the maintenance of farm income by direct payment to farmers and permitted the sale of farm products in a free market. Congressional hearings were held on this subject during which the Secretary stated that Title II of the Act of 1948 was, in his opinion, broad enough to permit direct payment to farmers. So much opposition developed to the plan, however, that it was speedily abandoned and Congress repealed Title II of the Act of 1948 and passed the Agricultural Act of 1949.

General provisions contained in subchapter I of this statute define the power and authority of the Secretary of Agriculture in providing the price support authorized or required by the Act. The Secretary is directed by § 401 of the Act, 7 U.S.C.A. § 1421, to provide the price support through CCC. Section 407, 7 U.S.C.A. § 1427, provides that the corporation may sell any farm commodity at any price not prohibited by the section. Basic agricultural commodities and storable nonbasic commodities may not be sold at less than 5 per cent above the current support price; but no restrictions as to price are placed upon nonstorable or nonbasic commodities such as milk, butterfat and the products thereof. Section 406, 7 U.S.C.A. § 1426, directs the Secretary, in so far as is practicable, to announce the level of price support for agricultural commodities, other than field crops, in advance of the beginning of the marketing year or season, and the level of price supports so announced cannot be reduced during the year. Section 412, 7 U.S.C.A. § 1429, provides that determinations made by the Secretary under the statute are final and conclusive, provided that they are not inconsistent with the provisions of the Commodity Credit Corporation Charter Act, 15 U.S.C.A. § 714 et seq.

The specific provision for the support of the prices of milk, butterfat and the products of these commodities is set out in § 201, 7 U.S.C.A. § 1446(c), set out above, which provides that the price level shall not be in excess of 90 per centum or less than 75 per centum of the parity price and that price support shall be provided through "loans on, or purchases of" the products of milk and butterfat.

Under this statute a series of annual dairy price support programs, each to take effect on April 1st for the period of one year, were formulated and announced. The program for the year 1953–54 may be taken as typical, since it was similar in all essentials to those which prevailed in prior years. The Secretary announced on February 27,

1953, that milk and butterfat would be supported at 90 per centum of parity for the marketing year beginning April 1, 1953, and the announcement was followed by the publication, on March 12, 1953, of the 1953–54 price support document which outlined the basic policies to be followed by CCC in the ensuing marketing year. It was announced that butter, cheese and nonfat dry milk solids would be purchased as products of milk and butterfat in carload lots, and that with respect to cheese the style that would be purchased was limited to Grade A Cheddar of large size; and that during the year CCC would purchase, at prices fixed in the document, all quantities of dairy products without regard to the identity of the seller or the source, age or market value of the cheese. The purchase price of cheddar was fixed at 37 cents per pound and the purchase price of butter at 65¾ cents per pound, which were estimated to produce prices for the dairy products representing 90 per centum of parity. Dairy products acquired were to be sold at such prices above the purchase price as the President might approve which would not discourage manufacturers, processors or dealers from carrying normal inventories. Subsequent press releases established a resale price at a standard markup of 2 cents per pound for cheese and 3 cents per pound for butter above the support purchase price in effect at the time of the resale. These markups were identical with those previously established in prior years.

Detailed procedures for carrying out the policies were also covered by announcements, which included Da–99 and Da–100 pertaining to the sale of butter and cheese to CCC, respectively, and Da–107 pertaining to the resale of these commodities by CCC. Da–100 was a standing offer by CCC to purchase at 37 cents a pound all the cheese offered which met the specifications and provisions were made for the inspection and grading of the product. Offers were subject to acceptance within two days and after acceptance delivery instruc-

tions were to be made within seven days, after which an additional seven days were allowed to seller for delivery. Da–99 contains similar provisions in regard to the purchase of butter. Da–107 contained the instructions for the purchase from CCC of specific lots of dairy products at the sale price in effect at the time. In the case of cheese, the product was sold on the basis of the grading certificate covering it when it was purchased and the purchaser was required after acceptance of his offer to furnish a certified check within two days, and delivery to the purchaser at the Government warehouse was to be made within two days after payment. Title to the product was to pass to the purchaser when the product was removed from the warehouse or at the end of six business days after the notice to deliver, whichever first happened. The evidence showed that any person who sold cheese to CCC could subsequently repurchase the same cheese if it was then still available. The products were stored at Government expense until they could be given away or resold, usually at a loss.

The price support program for the year 1953–54 resulted in an increased production of milk and large quantities of butter, cheddar cheese and nonfat dry milk solids so that great quantities of these articles were accumulated notwithstanding every effort to dispose of them. Accordingly, on February 15, 1954, the Secretary announced that for the ensuing marketing year the prices of milk and butterfat would be fixed at 75 per cent of parity, and on February 18 that the support price for butter would be 57½ cents per pound and for cheese 32¼ cents per pound during the marketing year April 1, 1954 to March 31, 1955.

The production of milk and butterfat during the 1953–54 year was well known and the announcement of the Secretary had been anticipated. The results of the change of policy were important. Prices paid to the farmers dropped suddenly and producers of cheese shifted from small-styles into large-styles which could be sold to CCC under the program of the

current marketing year. Cheese, however, could not be sold to CCC until it was ten days old and had been graded. Consequently the prices that would be paid by the manufacturers to the farmers after March 15, would naturally seek the level of the prices which would take effect after April 1. Moreover, it was to the interest of all holders of cheese and butter to sell their holdings to CCC prior to April 1, with the prospect of replenishing their stocks on the open market under the lower price levels that would prevail after April 1. It was even possible for the producers to arrange to repurchase identical lots after April 1.

Some difficulty stood in the way of those who desired to follow this course of conduct in the latter part of February. The requirements for grading cheese prior to purchase by CCC could not be met under the established practice before the end of March, but if the inspection requirements were relaxed it would be possible for a processor to sell his cheese to CCC at 37 cents a pound up until the end of March and later to repurchase the same or similar cheese on or after April 1st at the announced selling price of 34¼ cents a pound for the year 1954–55. Similar arrangements would be made for the sale and repurchase of butter. These transactions required the processors to furnish certified checks so that their money was tied up for considerable periods, and in the case of cheese the further expenditure of 1½ cents a pound for packaging was involved. Notwithstanding these drawbacks, it was to the interest of the manufacturers to sell their product at the March price and repurchase it at the April price. If they did so, the Government surplus would be largely increased and the adequacy of the processors' inventories to meet the demands of the public would be jeopardized.

These circumstances led the Secretary to adopt a special program applicable to March and April 1954, which gave rise to the transactions that are attacked in these suits. The Secretary issued a press release on March 4, 1954, which was followed on March 9, 1954, by announcement Da–112. Thereby the Secretary gave notice that for the remainder of the month of March CCC was prepared to purchase butter, cheese and nonfat dry milk solids under the 1953–54 program and to resell these commodities to the offerers at CCC domestic sales prices in effect during April. The offer to sell and repurchase was required to be submitted and accepted prior to the close of business of March 31. In each instance the transaction included an agreement on the part of the producer to repurchase the commodity in the case of butter on April 1, and in the case of cheese on April 1 or on the date of inspection, whichever was later.

The effect of such a transaction was, in the case of cheese, that the processor would sell its cheese to CCC at 37 cents per pound, the purchase price which had been fixed under the 1953–54 program, and would immediately repurchase the same for 34¼ cents per pound, the sales price fixed by the Secretary for the 1954–55 program. Certain procedures were outlined in announcement Da–112 in order to make these transactions feasible. The requirement as to inspection and grading of the cheese was relaxed so that it could be accomplished not later than April 30, after the offer to sell had been accepted instead of before acceptance as was the standard practice. Similarly the requirements for packaging and marketing the products in the case of cheese were relaxed.

Provisions relating to the delivery of the commodities and the passage of title were contained in the following provisions:

"9. Delivery:

"*Butter:* Butter offered under the terms of this announcement must have been graded before offered and must have been graded not later than March 31, 1954. Delivery to CCC and transfer of title shall be effected at the location at which it is graded, and at the time the offer is accepted subject to quality requirements set forth herein as

later evidenced by certificates issued by USDA.

"*Cheese:* Cheese offered under this announcement must be in existence, dated, and owned or under consignment to offerer not later than March 31, 1954. Delivery to CCC and transfer of title shall be effected at the location at which it is graded and at the time it is graded or when offer is accepted, whichever is later, subject to its meeting the quality requirements set forth herein, as later evidenced by certificates issued by USDA which may be dated after March 31, but not later than April 30, 1954.

\* \* \* \* \* \*

"The offerer, at his expense, shall hold for CCC at the location at which it is graded or sampled in case of milk, and delivered, the commodity which he has delivered to CCC from the time of delivery until CCC redelivers the commodity to the offerer. Failure of the offerer to hold the commodity for CCC until its redelivery to the offerer shall render the contract void."

Under these provisions there was no transfer of the custody of the products, which remained in the possession of the processors.

Certain provisions or options were given to the processors in order to encourage them to enter into the transaction of sale and repurchase. It was provided that if the CCC sale price in effect in April should be greater than the March 31 support purchase price, CCC would, at the offerer's request, relieve the seller of his liability to repurchase and to provide for its sale to CCC under announcements Da–99 and 100, which were standard in the 1953–54 year. The second option provided that under the same circumstances CCC would, at the offerer's request, render the contract void. These provisions were inserted to protect the processor in the event of the passage of certain bills pending in Congress which would have required the Secretary to establish the price level of farm products at 100 per cent of parity.

In practical effect, the offerer also had the option to cancel the contract to sell the goods to CCC and to sell them elsewhere. Paragraph 9, quoted above, provides that failure of the offerer to hold the commodities for CCC until redelivery renders the contract void. The apparent breach of contract in such a case did not form the basis for any substantial cause of action against the offerer because it would occasion no damage to CCC but would actually result in a saving of money.

The transactions were further facilitated by the provision that settlement for the commodities purchased and resold should be merely on the basis of vouchers submitted by the offerer claiming the net difference between the sales price and repurchase price. The payment of this difference by CCC was the only money that passed hands in the course of the transactions.

On March 23, 1954, the dairy price support program was modified by making it applicable to so-called small-style cheeses. These had been excluded from the standard program and also from the program of Da–112, and in view of unfavorable conditions the manufacture of these styles had practically stopped. This was an unfortunate development since these cheeses were the most readily salable so they were included by the amendment in Da–112 and also in the program for the year 1954–55.

The practical effect of the program was that 132 contracts were entered into under Da–112 for the sale of 5 million pounds of butter and 86 million pounds of cheese and all of the contracts for the purchase of butter and all except six of the contracts for the purchase of cheese, involving 252,683 pounds, were actually performed and payments were made by the Government. The economic effect of these transactions was described in the testimony of officials of the Department of Agriculture and of expert witnesses who testified on behalf of the

defendants. In their opinion the transactions (1) helped to support the price paid to dairy farmers for milk and butterfat during the month of March; (2) tended to assure the effectiveness of support activities during the ensuing year and to minimize the expense thereof; (3) promoted the orderly distribution of dairy products and the commercial consumption thereof; (4) saved the Government money and prevented useless expenditures by the butter and cheese industry.

The area of controversy is centered upon the meaning to be given to the direction of Congress that the Secretary, in performing the duty to support the price level of the products of milk and butterfat, must confine himself to loans on or purchases of the products. The controversy is narrowed in this instance to the meaning of the word "purchases", since loans were not attempted. In general terms, the position of the Government is that the word is to be given its normal meaning because there is nothing in the Act to indicate that a special meaning was intended and, more particularly, because the legislative history shows beyond dispute that Congress intended to forbid the Secretary to support the predetermined price level by direct payments or subsidies or "any other operations" than loans or purchases. Since the transactions undertaken by the Secretary under Da–112 did not constitute purchases in any realistic sense, they were not authorized by the statute and the payments made to the defendants must be returned. In addition, it is contended, for a number of reasons, that the transactions under Da–112 did not tend to effectuate the purpose of the statute to support the prices of dairy products in order to assure an adequate supply.

The defendants take a broader view of the meaning of the Act. They say that Congress omitted from the Act provisions empowering the Secretary to make "payments" or to engage "in other operations" to support prices, only to prohibit such operations as might tend to lower the market prices paid for the products, and that "there is nothing whatsoever to indicate that Congress intended to prohibit any transactions which would support the price of cheese and butter." Hence the transactions under Da–112 were in conformity with the law, because on their face they purported to be purchases involving the transfer of title to specific commodities at a specified time for a specified consideration, and also because the economic effect of the transactions in keeping up the level of prices, was the same as any ordinary purchase of products. In any event, it is said that the matter is not open to question in the courts since the Secretary properly determined that the transactions were purchases which would accomplish the purposes of the statute, and his determinations are made final and conclusive by § 412 of the statute, 7 U.S.C.A. § 1429.

█ It is our view that the Government's position is correct, and we reach this conclusion irrespective of the effect that the Da–112 transactions may have had upon the price level of dairy products or the maintenance of the processors' inventories. The so-called sales of cheese and butter by the processors were not purchases by CCC in any normal sense of the word. The products never left the possession of the processors or came into the hands of the United States and were never intended to do so. In short, the products never moved and there was no delivery or intention to deliver. Storage, handling and transportation charges connected with the sale or resale were "for the account of the offerer" (processor), and the offerer assumed all risk of loss. The Government through CCC obtained no right to sell the goods to other parties but was obliged to resell them at a loss to the processor. On the other hand, the processor not only retained physical possession of the products but full power to disregard his contract to sell and repurchase and to dispose of or sell them to anyone he pleased without incurring any liability to the Government. CCC did not pay for the products which it purported to

buy and the processors did not pay for the products which they purported to buy back. Both transactions were settled by one check of the CCC for the loss incurred in the transaction, which it agreed in advance to assume.

In view of these established facts, the reference in paragraph 9 of Da–112, quoted above, to the delivery of butter and cheese and the transfer of title to the products, back and forth, had no actual significance. The transactions were correctly characterized in the testimony of the Chief of the Dairy Division of the Department of Agriculture before the Fountain Committee of Congress. He said that delivery and transfer of title under Da–112 was really just a paper transaction, which ended up with the Government owing the cheese manufacturer 2¾ cents a pound on all the cheese on which he had submitted claims; that instead of the Government buying the cheese from the manufacturer and the manufacturer then buying it back, what actually happened was that CCC sent the manufacturer a check for the 2¾ cents difference.

The Department of Agriculture has itself recognized that a sale and simultaneous repurchase of products at a loss does not involve a genuine purchase and sale. In a series of opinions by the Solicitor to the Secretary of the Department of Agriculture, which were supported by opinions of the Attorney General of the United States, it was pointed out that the Secretary was not authorized by the statute to support the price of dairy products by direct payments but only by loans and purchases, and it was specifically stated in the opinion by the Solicitor on October 15, 1954, that a purchase of commodities from a processor and the simultaneous sale back at a lower price "would constitute a mere device for the purpose of accomplishing by indirection what could not be accomplished directly."[1]

The defendants contend that these opinions have no bearing on the question before the court because they were not directed to the programs of price control promulgated by the Secretary under the Act of 1949 but were spoken in condemnation of programs which would not accomplish the removal of surplus commodities from the market but allow them to find their own level in free competition. Even so, it is plain that the Department does not rest its actions on the reality of Da–112 transactions as purchases and sales, but on the ground that the Secretary has the power to follow any course which, in his opinion, will support prices at the desired level. In our judgment this position is untenable in view of the clear intent of Congress to confine the methods of the Secretary to purchases or loans.

There is no parallel between the facts of this case and those in N. L. R. B. v. Hearst Publications, 322 U.S. 111, 64 S. Ct. 851, 88 L.Ed. 1170, on which the defendants base their contention as to the extent of the Secretary's discretion. In that case the court accepted the conclusion of the Labor Board that newsboys continuously and regularly engaged in selling papers are entitled to the protection of the National Labor Relations Act, 29 U.S.C.A. § 152(3) as "employees" of the publishers, who control the buying and selling prices, the markets, supplies and hours of labor, and furnish a substantial part of the equipment. The court held that, in reviewing the ultimate conclusions of the Board, it should not substitute its inference of fact for those of the Board if they are supported by substantial evidence and have a reasonable basis in the law. This decision is not persuasive here since Congress, after giving careful consideration to the mat-

---

1. See the opinions of the Solicitor of the Department of Agriculture, May 7, 1954 and October 13, 1954; the opinions of the Attorney General, June 9, 1954 and December 29, 1954; and the letter of the Secretary to the Speaker of the House of Representatives, January 3, 1955, in which it was said that additional legislation would be needed to authorize a method of payment by the purchase-and-sale at a loss or a "wash sale" plan.

ter, denied the Secretary broad discretion as to the methods of price support, and confined him to those specifically enumerated in the Act.

■ Differences in opinion have arisen in this case as to the economic effect of Da–112 transactions. It is conceded that the program saved money not only for the processor but also for the Government, but it is insisted, for a number of reasons, that there is no reasonable ground for the view that they tended to support the market prices of the products for the benefit of the dairy industry. We do not enter into this controversy. We ground our opinion on the conclusion that it was well within the power of Congress to determine what methods should be employed to solve the economic problems arising in a difficult field and that the mandate of Congress must be obeyed.

■ The District Judge denied interest prior to judgment on the sums received by the defendants on the ground that its allowance would be inequitable under all the circumstances of the case. The Government does not dispute the general rule that in suits for the enforcement of quasi contractual obligations arising from payments of money by mistake, interest is not allowed as a matter of right but depends upon considerations of practical justice and fairness. Board of Com'rs of Jackson County v. United States, 308 U.S. 343, 350, 60 S.Ct. 285, 84 L.Ed. 313; Royal Indemnity Co. v. United States, 313 U.S. 289, 296, 61 S. Ct. 995, 85 L.Ed. 1361; United States v. Bass, 8 Cir., 215 F.2d 9. The circumstances of the present controversy fully justify the application of the rule "which comports best with general notions of equity." · The defendants entered into the transactions which gave rise to the present suits at the invitation of the United States, in the belief on both sides, that the payments were made in accordance with the governing statutes. Although it now appears that the payments were improperly made, it is conceded that one of the results of the trans-

actions was the saving of a considerable outlay of money on the part of the United States. Furthermore, the department of the Government most concerned insisted for more than two years after the payments were made that the defendants were entitled to retain them, and apparently still holds this view notwithstanding the contrary opinion of the representatives of the Government who prosecute these suits. In view of these facts, it would be inequitable to add interest prior to the date when the judgments were rendered.

Affirmed.