## NATIONAL CORN GROWERS ASSOCIATION et al., Plaintiffs,

v.

### Robert S. BERGLAND, Secretary of Agriculture, et al., Defendants.

Civ. No. 77-298-1.

United States District Court, S. D. Iowa, Central Division.

April 27, 1979.

Ralph W. Gearhart, Jr., and Robert O. Daniel, Shuttleworth & Ingersoll, Cedar Rapids, Iowa, for National Corn Growers Assn.

H. Richard Smith, Paul F. Ahlers, and Lance A. Coppock, Ahlers, Cooney, Dorweiler, Haynie & Smith, Des Moines, Iowa, and H. Thomas Austern, Paul J. Tagliabue and Theodore Voorhees, Covington & Burling, Washington, D. C., for Corn Refiners.

William Z. Elliott, Barbara Allen Babcock, William P. Arnold R. Joseph Sher, Dept. of Justice, Thomas V. Conway, Atty., Dept. of Agriculture, Washington, D. C., Roxanne Barton Conlin, U. S. Atty., So. Dist. of Iowa, Des Moines, Iowa, for defendants.

L. Call Dickinson, Jr., Dickinson, Throckmorton, Parker, Mannheimer & Raife, Des Moines, Iowa, and Charles S. Murphy, Wilbur L. Fugate, Morison, Murphy, Abrams & Haddock, Washington, D. C., for defendants-intervenors.

## MEMORANDUM OPINION AND ORDER

STUART, Chief Judge.

The Court has before it the parties' cross-motions for partial summary judgment as to Count I of the complaint, filed on April 17, 1978 and August 22, 1978. The matter came on for hearing on November 20, 1978 at 3:00 p. m. with all parties represented by counsel. Upon the Court's own motion and the acquiescence of the parties, it was determined that the issues raised in Count I would be deemed disposed of on the merits by the Court's ruling herein, thereby allowing certain factual inferences to be drawn from the evidence and arguments presented which would otherwise preclude summary judgment at this time.

The instant lawsuit seeks declaratory and injunctive relief for defendants' allegedly unlawful refusal to implement certain provisions of the Food and Agriculture Act of 1977, P.L. 95–113, [the Act], particularly that portion of the Act instituting sugar price supports, commonly known as the de la Garza amendment. [§ 902, 7 U.S.C.

§ 1446(f)].[1] Count I of the complaint alleges that the direct subsidy payments made to sugar processors pursuant to an "interim" program promulgated under subsection (3) by the United States Department of Agriculture [USDA] and the Secretary of Agriculture [the Secretary], for sugar delivered after December 8, 1977 (30 days after the actual implementation date of the de la Garza amendment and its congressionally mandated price support loan/purchase program), violated the de la Garza amendment and were, therefore, illegal. More specifically, Count I challenges the legality of defendants' conduct in delaying implementation of the required loan program and the issuance of a payment or direct subsidy program which effectively defeated the price support objectives of the de la Garza amendment.

The Food and Agriculture Act of 1977 was passed by Congress in September of 1977 and signed into law by the President on September 29, 1977, to become effective October 1st. Section 902 thereof expressly authorized the extension of price supports to the 1977 and 1978 crops of sugar cane and sugar beets via loans or purchases from eligible processors.

There are three commonly utilized types of price support programs: (1) the loan program, (2) the purchase program, and (3) the payment or direct subsidy program. The first two types, which were expressly authorized by the de la Garza amendment, employ a market-enhancing technique whereby the government actually enters the market place as a potential purchaser of the commodity in question, thereby guaranteeing that the market price will not fall below the government's stated price support floor.[2]

The payment or direct subsidy program, on the other hand, does not employ a market support price in the technical sense. Rather, it allows processors to sell their product on the open market at the going rate, thereafter subsidizing them for any difference between the competitive open market price and the established price support level. It, thus, has little or no tangible market-enhancing effect. Although plaintiffs are not eligible to receive any direct benefit from the de la Garza amendment in the form of a loan or purchase, as competitors of the sugar cane and sugar beet industry they are interested in the successful implementation of a market-enhancing program. *See* Order filed July 13, 1978, deny-

1. Section 902 of the Act was introduced by Congressman de la Garza of Texas. The full text of § 902 provides:

   The Secretary is authorized and directed to make available (without regard to the provisions of title III [section 301 and 303 of the 1949 Act]) price support to producers of * * sugar beets, and sugar cane as follows:

   \* \* \* \* \* \*

   (f)(1) The price of the 1977 and 1978 crops of sugar beets and sugar cane, respectively, shall be supported through loans or purchases with respect to the processed products thereof at a level not in excess of 65 per centum nor less than 52.5 per centum of the parity price therefor; *Provided,* That the support level may in no event be less than 13.5 cents per pound raw sugar equivalent. In carrying out the price support program authorized by this subsection, the Secretary shall establish minimum wage rates for agricultural employees engaged in the production of sugar.

   (2) Notwithstanding any other provision of law, the Secretary may suspend the operation of the price support program authorized

by this subsection whenever the Secretary determines that an international sugar agreement is in effect which assures the maintenance in the United States of a price for sugar not less than 13.5 cents per pound raw sugar equivalent.

   (3) *Nothing in this subsection shall affect the authority of the Secretary to establish under any other provision of law a price support program for that portion of the 1977 crop of sugar cane and sugar beets marketed prior to the implementation of the program authorized by this subsection.* [Emphasis supplied]

2. The Secretary ultimately opted in favor of a loan program. Under such a program, the Secretary makes loans to sugar processors in an amount equal to the stated market support level, with the sugar itself acting as collateral for the loan. The sugar is then placed in storage. If the market price subsequently rises above the support price level, the processor, upon repaying the full price of the loan plus interest, may redeem his collateral and sell the sugar on the open market at the higher price.

ing defendants' motion to dismiss or for summary judgment for mootness, lack of standing and/or failure to state a claim upon which relief can be granted, at 3–4.

Subsection (3) of the de la Garza amendment, authorizing the establishment of an interim program, was enacted as part of the overall legislation to insure fair and equitable treatment of all processors, including those whose crop years would preclude them from participation in the loan program. *See* Cong.Rec.S. 14571, September 9, 1977; Conf.Report 95–418, 9A U.S.Code Cong. & Admin.News, pp. 3226, 3996 (1977). The effect of subsection (3) has generated a substantial portion of the present controversy.

Ostensibly pursuant to the authorization contained in subsection (3), the Secretary instituted an interim direct subsidy program on October 7. *See* 42 Fed.Reg. 54556. It appears that work on the loan program was deferred while the USDA's direct subsidy payment program was instituted. *See* Exhibit K, attached to plaintiff's Motion for Summary Judgment on Count I, filed April 17, 1978, Memorandum of Robert R. Stansberry to Ray Fitzgerald, Administrator of the USDA's Agricultural Stabilization and Conservation Service [ASCS], dated September 27, 1977. Hence the loan program and its accompanying regulations were not completed on October 1, 1977, the effective date of the Act.

On October 13, 1977, plaintiffs filed the complaint herein. On November 7, 1977, the regulations governing the direct subsidy payment program were amended in anticipation of implementation of the loan program. The loan program was, in fact, instituted on November 11, 1977, retroactive to November 8. *See* 42 Fed.Reg. 57948, 58734. The first loan extended under the de la Garza amendment was issued on December 12, 1977. The direct subsidy program was again amended on December 28, 1977 to broaden eligibility for the interim program. *See* 42 Fed.Reg. 64677.

With that background in mind, the Court now turns to the issues before it. The Court would note parenthetically that its current concern is solely with the allegations contained in Count I. For purposes of this Order only, the Court will consider the subsidy program an authorized "other operation" under the Agricultural Act of 1949, 7 U.S.C. § 1421 *et seq.* Hence the Court will not be addressing the allegations contained in Counts II and III regarding the *per se* illegality of the subsidy program for failure to comply with the 1949 and 1977 Acts and/or the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

Plaintiffs contend herein that defendants (1) failed to implement the loan program promptly in accordance with congressional directives and (2) continued the unlawful administration of the "interim" direct subsidy program after the loan program was belatedly instituted. Defendants argue conversely that (1) the loan program was implemented in a timely fashion; (2) the Secretary was expressly authorized to maintain the direct subsidy payment program for that portion of the 1977 crop marketed prior to the timely implementation of the de la Garza amendment; and (3) the subsidy program was superceded by the loan program as to 1977 and 1978 crops marketed after its implementation in accordance with the law. Of particular importance to both parties' arguments is the definition afforded the key phrase "marketed prior to", as will be discussed more fully *infra.*

## I. *Timely Implementation of de la Garza*

Plaintiffs' argument concerning the timely implementation of the de la Garza amendment is two-fold. First, plaintiffs contend that defendants wrongfully failed to formulate the required loan/purchase program and issue regulations *prior* to the effective date of the Act as requested by Congress. Second, they allege that defendants consciously delayed implementation for thirty-eight days after the October 1, 1977 effective date. Interspersed throughout plaintiffs' argument are references to certain exhibits tending to show that the USDA was opposed to the loan/purchase price support concept, preferring direct sub-

sidy payments which would subsidize the cane and beet sugar industry without affecting the market price, thereby tending to discourage competition from the fructose sugar industry. However, the Court does not deem the existence of an anti-competitive animus relevant to determining the legality of the Secretary's actions and, except to the extent such motivation casts some light on the reasonableness of the regulations, the evidence pertaining thereto will be disregarded.

Defendants initially fault plaintiffs' alleged reliance on de la Garza's legislative history, since the statute is deemed clear on its face, obviating the need to resort to outside sources to ascertain its meaning. However, should the Court consider such evidence, they urge that plaintiffs' strained construction is at odds with the Secretary's recognized authority to make interim price supports available through "loans, purchases, *or other operations*". [Emphasis supplied] The fact that the Secretary chose a direct subsidy payment program over a loan or purchase scheme thus was a matter within his discretion.

Defendants further contend that the Conference Committee's statement that "loan and purchase and wage rate provisions be implemented without any delay upon the bill becoming effective" cannot be read to require that the loan program had to be implemented no later than the Act's October 1st effective date. They argue that if Congress had meant for implementation to be complete as of the amendment's effective date, the modifying phrase "without any delay" contained in the Committee Report would be meaningless surplusage. In fact, according to defendants, the Secretary did implement the loan and wage provisions expeditiously, in accordance with Congressional intent and consistent with the de la Garza amendment.

Further, defendants state that while it is true that the first loan pursuant to the de la Garza loan program was issued on December 21, 1977, the time lag was not due to any delay in implementation. Rather, defendants point out that the first inquiry

regarding the loan program was not made until November 11, 1977; no other completed loan applications were submitted prior to the issuance of the initial loan on December 21st.

Despite defendants' contentions, the Court has no difficulty in concluding the Congress intended the de la Garza amendment and the loan program pursuant thereto to be implemented as of the effective date of the Act, *i. e.,* October 1, 1977. If the statutory mandate were not clear enough, the legislative history offers compelling evidence of Congress' concern for the domestic sugar industry and its commitment to expeditious implementation of the loan/purchase program. Although not binding on the Secretary, the Conference Report issued by the Senate Committee recommended that "the Secretary of Agriculture implement the program called for by the House amendment *as soon as possible— even before the Act is signed into law."* [Emphasis supplied] *Senate Report,* No. 95–418, 95th Cong., 1st Sess., p. 174 (1977), U.S.Code Cong. & Admin.News 1977, pp. 2445, 2474. Secretary Bergland was obviously cognizant of this concern. He assured the conferees on August 3, 1977, two days before the bill was adopted by the House-Senate Conference on the Farm Bill on August 5, that in exchange for certain concessions related to lowering the parity support level for sugar, the USDA would immediately commence implementation of the loan/purchase scheme authorized by the amendment. Cong.Rec., October 1, 1977, S. 16101. That clearly was not done.

II. *Validity of Continued Administration of Subsidy Program After Implementation of de la Garza Loan Program*

Although the parties have stressed the importance of timely implementation, what is concededly the key issue herein remains to be decided: whether the Secretary violated the de la Garza amendment by continuing to administer the direct subsidy payment program after the implementation of the loan program on November 8, 1977. Before reaching the substance of that claim

and the concomitant inquiry into the legitimacy of the definition(s) assigned § 902(f)(3)'s key phrase "marketed prior to", however, the Court must address the threshold question of availability of judicial review.

## A. Availability of Judicial Review

Defendant-intervenors strenuously urge that judicial review by this Court is precluded under 7 U.S.C. §§ 1421(b) and 1429 of the Agricultural Act of 1949, which provide that the Secretary's determinations regarding "the amounts, terms, and conditions of price support operations and the extent to which such operations are carried out" are to be deemed "final and conclusive". Although defendant-intervenors agree that acts outside the Secretary's express or implied powers are subject to judicial review, given the expansive definition afforded the term "marketed" in the 1949 Act,[3] they argue the Secretary was merely acting within the permissible bounds of his discretion in instituting and administering the interim direct subsidy program as he did.

■ Section 701 of the Administrative Procedure Act, 5 U.S.C. § 701, provides that the action of "each authority of the Government of the United States", including the USDA and the Secretary of Agriculture, is subject to judicial review except (1) where there is a statutory prohibition on review or (2) where "agency action is committed to agency discretion by law". The presumption lies in favor of unrestricted access to judicial review unless there is "clear and convincing evidence" of a contrary legislative intent. Mere failure to expressly provide for judicial review within a statute cannot be construed as implicit evidence of an intent to withhold review. *Dunlop v. Bachowski,* 421 U.S. 560, 567, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Abbott*

*Laboratories v. Gardner,* 387 U.S. 136, 139, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

■ The Court is not persuaded that the "final and conclusive" language contained in § 1429 of the 1949 Act constitutes the kind of express statutory prohibition designed to preclude review of the Secretary's actions taken pursuant to authorization contained in § 902(f)(3) of the de la Garza amendment. The grant of authority contained in subsection (f)(3) is expressly subordinate to the overall purpose of the de la Garza amendment, namely, to institute sugar beet and cane price supports through the implementation of a loan or purchase scheme. Actions by the Secretary contrary to that overriding congressional mandate fall outside his express or implied powers and are subject to judicial review. *Harmon v. Brucker,* 355 U.S. 579, 581–82, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958). Given the unmistakable import of the de la Garza amendment, the Court believes Congress, had it intended the Secretary's subsection (f)(3) interim program to be beyond judicial purview, would have said so directly. *See, Shaughnessy v. Pedreiro,* 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868 (1955); *Land O'Lakes Creameries, Inc. v. Commodity Credit Corp.,* 265 F.2d 163, 165–66 (8th Cir. 1959).

■ Nor does the Court believe the Secretary's actions were entirely "committed to agency discretion by law" thereby evading judicial scrutiny. Again, the Secretary's authority under the Agricultural Act of 1949 must be examined within the shadow of the de la Garza amendment. That statutory overlay unmistakably directed the Secretary to implement a loan or purchase program to the exclusion of any other type of price support scheme. There was no discretionary authority contained therein to extend subsidies to 1977 and 1978 crops marketed *after* the implementation date of said loan/purchase program, even if the

---

**3.** The Agricultural Adjustment Act of 1938, 7 U.S.C. § 1281, *et seq.,* to which the Agricultural Act of 1949 refers for some definitions [§ 1428(j)], defines the term "market" to mean "to dispose of, in raw or processed form, by

voluntary or involuntary sale, barter, or exchange, or by gift inter vivos, . . . or the products of which, are sold, bartered, or exchanged, or to be so disposed of . . ." 7 U.S.C. § 1301(6)(A).

direct subsidy payment program standing alone was a valid, authorized "other operation" under the 1949 Act. In fact, it was expressly prohibited. Thus, actions taken after the November 8, 1977 implementation date must be subject to judicial review to determine whether they are consistent and comply with the congressional mandate of de la Garza. *See Swift & Co. v. United States,* 257 F.2d 787, 795 (4th Cir. 1958), *cert. denied,* 358 U.S. 837, 79 S.Ct. 60, 3 L.Ed.2d 73 (1958).

B. *Reasonableness of USDA's Definition of "Marketed Prior To"*

Having determined that judicial review is appropriate in this case, the Court now reaches consideration of the legality of the USDA's continued administration of the direct subsidy payment program after November 8, 1977. The former status of sugar as a nondesignated, nonbasic agricultural commodity was altered by the de la Garza amendment, which added sugar to the list of designated nonbasic commodities subject only to a price support loan or purchase program. Subsection (f)(3) provided a limited exception to that designation by allowing an interim price support program at the Secretary's option for "that portion of the 1977 crop of sugar cane and sugar beets marketed prior to the implementation of the program authorized by this subsection".

An interim direct subsidy payment program was issued by the Secretary on October 7, 1977. Several months earlier, on June 14, 1977, the Secretary had published his proposed notice of rulemaking establishing a similar subsidy scheme for sugar. 42 Fed.Reg. 30409. That proposal was subsequently withdrawn due to legal objections by the Department of Justice and the Comptroller General as to its direct payment provisions. The June 14 program, with those objections modified, did, however, form the basis of the now-challenged October 7 subsidy program. The USDA's accompanying regulations employed a broad and somewhat vague definition of the term "marketed". Under the October 7 guidelines, cane or beet sugar was deemed

"marketed" when (1) delivered to a purchaser, (2) delivered to a carrier for delivery to a purchaser, (3) title otherwise passed to a purchaser, or (4) the sugar was contracted or committed for future delivery.

In operation, that nebulous definition proved to be a source of potential "serious program abuse". Knowing that the de la Garza loan program was about to be implemented, the USDA issued an amendment redefining "marketed", designed to encompass cane syrup mills and limiting future delivery periods to thirty days. More specifically, the November 7, 1977 revision provided that:

Refined beet sugar or raw cane sugar shall be deemed to have been marketed during the marketing period when (i) delivered to the purchaser, or (ii) delivered to a carrier for delivery to the purchaser, or (iii) title otherwise passes to the purchaser and sugar is committed for delivery, within a period not to exceed 30 days following the end of the marketing period, under a written contract fixing both the quantity and price of sugar to be delivered within such 30-day period; but, in each of the preceding cases, only to the extent that gross proceeds are accounted to the seller within the marketing period:

. . .

42 Fed.Reg. 57918–19. This definition had the practical effect of limiting direct subsidy payments to fixed price contracts for sugar delivered within thirty days of implementation of the loan program (*i. e.,* November 8, 1977). USDA documents indicate the Department considered the subsidy program terminated as of November 8. *See* Plaintiffs' Motion for Partial Summary Judgment as to Count I, filed April 17, 1978, Exhibit A, at 2 (memo from Stansberry to Ray Fitzgerald, Administrator of ASCS, dated October 14, 1977); Exhibit B (USDA press release dated November 8, 1977); Exhibit I (memo from Stansberry to Fitzgerald dated November 17, 1977). From November 8 to December 27, 1977, the USDA appeared to be administering a single price support scheme in the form of a loan program.

The status of sugar price supports was again thrown into confusion on December 28, however, when the USDA issued its third and final modification. The term "marketed" was expanded to include

> such quantity of sugar [as] had been committed by the processor under a contractual agreement entered into prior to the end of the marketing period which (1) requires delivery to the purchaser on a scheduled basis or at the option of the purchaser and (2) specifies the method of determining the price of such sugar.

The reason for the December 28 amendment was stated as follows:

> According to information supplied to the Department, some domestic processors of sugar crops, who entered into contracts prior to November 8, 1977 [the implementation date of the loan program], committing a quantity of sugar for delivery to a purchaser are unable to obtain price support loans because of their obligations under such contracts of sale, yet their delivery and pricing schedules for such sugar do not permit them to obtain payments under the payment programs. As a result, some producers of 1977 crop sugar beets and sugar cane will not receive price support under either the price support payment or loan program for some or all of their crop.

42 Fed.Reg. 64677.

Plaintiffs argue that defendants' December 28 amendment, giving an open-ended definition to the term "marketed", was contrary to established USDA practice and operated to illegally extend the subsidy program past the November 8 implementation date of the de la Garza loan program. Defendants counter that the Secretary's actions with regard to the loan and subsidy programs were entirely consistent and reasonable and well within his authority as the administrative head of the agency empowered to implement the de la Garza amendment. They contend that the December 28 amendment was simply a permissible exercise of administrative discretion in an attempt to tailor the sugar price support programs so as to effectuate Congress' desire to treat all domestic sugar processors equally.

■ The Court cannot agree with defendants' assessment. While it is true that "great deference" is to be afforded the interpretation given a statute by the officers or agency charged with its administration, *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Zenith Radio Corp. v. United States,* 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978), the Court is not totally without obligation to remove its judicial blinders on occasion and scrutinize that interpretation more closely.

> This deference [to administrative interpretation] is a product both of an awareness of the practical expertise which an agency normally develops, and of a willingness to accord some measure of flexibility to such an agency as it encounters new and unforeseen problems over time. But this deference is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose and history.

*Internat'l Brotherhood of Teamsters v. Daniel,* —— U.S. ——, —— n. 20, 99 S.Ct. 790, 800, 58 L.Ed.2d 808 (1979). This is particularly true where the administrative agency's actions take such divergent and inconsistent turns over such a short period of time. When viewed in that light, the Court is compelled to conclude that the Secretary's actions were contrary to the "clear meaning" of the de la Garza amendment.

The anomalous nature of the December 28 definition of "marketed" is readily apparent both in terms of the normal meaning of the word and past agency practice. Comparable USDA price support programs have required that the market price of the support commodity be known or fixed before it could be deemed marketed. *See, e. g.,* National Wool Act of 1954, 7 U.S.C. §§ 1781–87; similar provisions re: mohair, 7 C.F.R. § 1468.7(a). See also *Mercantile Bank & Trust Co. v. United States,* 441 F.2d 364 (8th Cir. 1971); *Kananen v. Matthews,* 555 F.2d 667, 670 (8th Cir. 1977) (statute's terms to be afforded their plain and normal

meaning, unless such construction would render statute absurd or thwart its obvious purpose).

■ Given past USDA practice, Congress may well have assumed consistent treatment would be applied to the de la Garza amendment. The legislative history certainly underscores that intent. Congress made clear its desire for a loan or purchase program as soon as possible. Subsection (3) interim authorization was intended solely to protect processors whose harvesting periods fell earlier in the year and who, consequently, had sold their crops prior to implementation of the loan program. *See* Conference Report, Cong.Rec.S. 14571, September 9, 1977 (exchange between Sen. Matsunaga of Hawaii, author of § 902(f)(3), and Sen. Talmadge of the Conference Committee; § 902(f)(3) was included "specifically to take care of the Hawaiian problem", as more than half of the Hawaiian sugar crop had been harvested prior to adoption of the de la Garza amendment.) Thus, while it is conceivable that the direct subsidy payment program and the dispersal of funds thereunder may have continued for a period of time after the effective date of the Act due to the inevitable bureaucratic time lag, it is clear that Congress intended to narrowly circumscribe its function, limiting it solely to processors who were, in fact, ineligible for the loan program because their sugar had been sold prior to that date. The USDA's efforts to continue a tandem operation indefinitely pursuant to its December 28 amendment falls outside the statute's authorization.

Evidence was adduced at the November 20, 1978 hearing and in subsequent submissions to the Court indicating that $235.8 million was expended for 1977 crop sugar under the subsidy program in contrast to $374.1 million under the loan program. Those expenditures were allegedly subsequently approved by Congress in the appropriations bill passed at the close of the 1978 session. P.L. 95–448, 92 Stat. 1073 (October 11, 1978). Defendants attempted to argue that this action somehow operated as a retroactive ratification of the Secretary's actions, since, had Congress seriously objected to the subsidy program it presumably would have refused that portion of the bill financing it.

The bill referred to by defendants in fact merely appropriated funds to cover USDA's expenditures incurred prior to September 30, 1977. In addition, the 1978 bill approved "borrowing authority" for the Commodity Credit Corp. [CCC] of up to $5.5 billion to carry out its "authorized programs". To argue that the subsidy program as implemented was an "authorized program" is simply unacceptable. In any event, the Supreme Court has made clear that simple passage of an appropriations bill cannot serve to ratify otherwise unlawful government conduct. *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 189–93, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (snail darter case).

In the final analysis, then, there is unanimous agreement that sugar processors who lost the opportunity to participate in the loan program due to prior contractual obligations should not be penalized and denied all aid. The controversy centers around which processors may be deemed to qualify for inclusion in that discrete group. The Court believes that those entering into contracts after the effective date of the Act (*i. e.,* October 1, 1977) knew or should have known that what Congress had proposed and what would ultimately be implemented was a loan or purchase-type program. Apparently, processors entering into contracts after October 1, 1977 preferred coverage under the interim program, but they were not in reality committed to a contract on the effective date of the Act. They should not be allowed to circumvent such a clear congressional directive as that contained in the de la Garza amendment. Any preference exhibited by processors for the subsidy program was exacerbated by the Secretary's failure to implement the loan program in a timely fashion.

Accordingly, the Court concludes that those who entered into contracts for the sale of sugar after October 1, 1977 should not be eligible for participation in the inter-

im direct subsidy program. This holding serves to effectuate the purpose of subsection 902(f)(3) and, at the same time, excludes those processors who simply rushed into contracts in an attempt to secure coverage under the interim program.

The practical effect of the Court's ruling and the question of the appropriate relief to be afforded at this juncture for defendants' failure to implement the de la Garza amendment in a timely fashion and their unlawful expansion of the direct subsidy program, has caused the Court considerable concern. At this time, the assessment of any substantive relief will be deferred until the present status of the loan program and the full impact of damages sustained, if any, has been ascertained. The Court specifically reserves for future determination of appropriate relief, the effect of this ruling upon such contracts executed prior to October 1, 1977, which would have been considered "marketed" under the December 28, 1977 amendment to the USDA's regulations.

### III. *Plaintiff's Motion to Compel Production of Documents*

Still pending before this Court is plaintiff Corn Refiners Association's motion to compel immediate production of documents, filed June 22, 1978. At the oral hearing on October 6, 1978, the Court advised counsel that a ruling on the sensitive issues presented by that motion would be reserved until a decision had been made on the instant cross-motions for partial summary judgment. There was a general consensus that a ruling in favor of plaintiffs with regard to Count I would obviate the need to consider plaintiffs' Rule 37(b) claims, except perhaps as the missing documents might relate to the question of damages.

Although the Court believes the ruling herein to be dispositive, it will grant plaintiffs ten (10) days from the date of filing of this Order to indicate their position regarding the status of the motion to compel; defendants will be given ten (10) days thereafter to respond.

### IV. *Certification as a Final Judgment*

The Court would note finally its express determination that the judgment entered herein should be certified as a final judgment pursuant to Federal Rule of Civil Procedure 54(b). The instant ruling disposes of the above-captioned litigation for all practical purposes and the Court can discern no just or legitimate reason for delaying the entry of final judgment as to the issues adjudicated herein. This case presents questions of great importance to all the litigants and the Court believes an expeditious resolution of the controversy, undoubtedly via the avenue of appeal to a higher court, would serve the best interests of justice.

IT IS THEREFORE ORDERED that final judgment shall be and the same hereby is entered for plaintiffs and against the defendants on Count I herein.

IT IS FURTHER ORDERED that plaintiffs report to the Court within ten (10) days of the date of filing of this Order regarding the status of the pending motion to compel. Defendants shall file any response desired within ten (10) days of the date of filing of plaintiffs' report.