The NATIONAL ASSOCIATION OF PSYCHIATRIC TREATMENT CENTERS FOR CHILDREN, an Oklahoma Nonprofit Corporation; the American Association of Children's Residential Centers, a Kansas Nonprofit Corporation; Coalition of Concerned Physicians of San Diego, a California Nonprofit, Unincorporated Association; and Dori Nanry, on behalf of herself and her minor child, Plaintiffs,

v.

Caspar W. WEINBERGER, Secretary of Defense; William B. Mayer, Assistant Secretary of Defense, Health Affairs; Teresa Hawkes, Director of the Office of the Civilian Health and Medical Program of the Uniformed Services; and the Office of the Civilian Health and Medical Program of the Uniformed Services, Defendants.

Civ. A. No. 86–F–1024.

United States District Court,
D. Colorado.

Feb. 27, 1987.

Mark F. Leonard, Brownstein, Hyatt, Farber and Madden, Denver, Colo., Patric Hooper, Weissburg and Aronson, Inc., Los Angeles, Cal., for plaintiffs Nat. Ass'n of Psychiatric Treatment Centers for Children, The American Ass'n of Children's Residential Centers, and Dori Nanry.

Agim M. Demirali, Demirali and Associates, Denver, Colo., Alvin G. Kalmanson, Jennings, Engstrand and Henrikson, San Diego, Cal., for Coalition of Concerned Physicians of San Diego.

Dahil Goss, Asst. U.S. Atty., Denver, Colo., Shalom Brilliant, Civil Div., Dept. of Justice, Washington, D.C., Gerald A. Wesley, Asst. Gen. Counsel, Office of the Civilian Health and Medical Program of the Uniformed Services, Dept. of Defense, Aurora, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

SHERMAN G. FINESILVER, Chief Judge.

THIS MATTER is before the Court on dispositive Cross-Motions. Because the parties rely on exhibits, declarations and affidavits outside the pleadings, we will treat the motions as Motions for Summary Judgment. Rules 12 and 56, Fed.R.Civ.P. For the reasons expressed below, the plaintiffs' Motion for Summary Judgment is GRANTED, and the defendants' Motion for Summary Judgment is DENIED.

### I. Factual and Procedural Background

This action involves the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), a health care benefit program for the families and members of the uniformed services. A significant health care benefit available under CHAMPUS is mental health services provided by Residential Treatment Centers (RTCs) to the children of military families. CHAMPUS essentially shares in the costs of such services provided by civilian health care

facilities when the services are not readily available in military facilities. 10 U.S.C. § 1071 et seq. CHAMPUS regulations[1] provide standards by which payment for mental health services must be determined depending on whether they are furnished by institutional or professional providers.

32 C.F.R. § 199.12(b)(4)(v)(*4*) requires an RTC authorized under CHAMPUS to enter into a participation agreement with the Office of CHAMPUS (OCHAMPUS). The RTC must consent in the participation agreement to "[a]ccept payment for its services based on an allowable cost rate acceptable to the Director, OCHAMPUS, or such other method as determined by the Director, OCHAMPUS." Many RTCs do not employ all of the professionals necessary to render service to their patients. Rather, an RTC's professional staff may consist of independent professionals who enjoy "staff privileges" at the RTC. To date, separate charges have been submitted to and paid by OCHAMPUS for the institutional RTC services and the professional services provided to CHAMPUS RTC patients. Under C.F.R. § 199.12(e)(2), the CHAMPUS program has reimbursed RTCs for their reasonable charges. Pursuant to 32 C.F.R. § 199.12(e)(3), OCHAMPUS has reimbursed individual health care professionals either the lower of the billed charges for their services or the 80th percentile of a prevailing charge level.

In the September 14, 1984 Federal Register, OCHAMPUS published a notice stating its intention to institute changes in the payment system for RTCs. The notice provided that each RTC would have to enter into a new participation agreement by June 1, 1985. 49 Fed.Reg. at 36094. The notice did not specify any terms of the new participation agreement. By separate notice dated July 1, 1985, OCHAMPUS delayed the

effective date of the new agreement until October 1, 1985. 50 Fed.Reg. 26988.

By attachment to letters of October 18, 1985 OCHAMPUS notified RTCs of the terms and conditions of a draft proposed participation agreement. *See* plaintiff's exhibits B and C in support of motion for preliminary injunction.[2] OCHAMPUS then announced a new effective date of March 1, 1986 for the agreement. *See* plaintiff's exhibit E to the motion for preliminary injunction. Plaintiffs National Association of Psychiatric Treatment Centers for Children (NAPTCC) and Coalition of Concerned Physicians of San Diego (CCPSD) thereafter submitted written oppositions to the terms and conditions of the proposal. *See* plaintiff's exhibits F and G to the motion for preliminary injunction.

Defendants made numerous changes in the proposed agreement. The final version contains the following provisions, to which the plaintiffs object:

1. A prospectively determined, all-inclusive rate purportedly reflecting each RTC's actual charges during the year ending February 28, 1985 is established to cover *all* components of mental health services rendered to CHAMPUS beneficiaries while they are residing in an RTC, including services rendered by outside professionals;

2. The actual per diem rate allowed an RTC is purportedly determined by the lowest of: (a) the CHAMPUS rate paid to the RTC of the all-inclusive services as of March 1, 1985; (b) the per diem rate accepted by the RTC from any other agency of organization (public or private) or individual that is high enough to cover one-third of the total patient days during the 12–month period ending February 28, 1985; or (c) a capped, all-inclusive per diem rate of $248;

---

**1.** The Secretary of Defense has published a revised version of 32 C.F.R. part 199 in the Federal Register. The revisions appear largely technical in nature. The provisions relevant to this case have been renumbered. However, to avoid confusion, this opinion cites the regulations printed in the July 1, 1985 version of 32 C.F.R.

**2.** This original draft of the proposed agreement provided that RTCs would be reimbursed on the basis of a prospectively determined all-inclusive rate intended to reflect each RTC's actual charging practices during the year ending February 28, 1985. The rate was to cover *all* components of RTC services, including those rendered by outside professionals.

3. The costs of educational services are generally excluded from reimbursement. *See* plaintiffs' exhibit L to the motion for preliminary injunction, at ¶¶ 2.4, 4.1 and 5.1.

Plaintiffs generally assert:

1. the participation agreement was formed in a procedurally invalid manner, because: (a) the participation agreement is a rule, formulation of which is subject to the procedural requirements of the Administrative Procedure Act (APA); and (b) OCHAMPUS failed to consult with appropriate agencies, as required by statute, when creating the agreement; and

2. the participation agreement is substantively invalid, as its terms conflict with applicable statutory and regulatory standards and are arbitrary and capricious.

Defendants deny these allegations. They claim in addition that (1) the substance of the participation agreement is not properly subject to judicial review, and (2) even if the agreement is a rule, the contracts exemption to the APA rulemaking requirements applies. Plaintiffs initiated this action on May 15, 1986, and filed a motion for preliminary injunction on June 12, 1986. Defendants responded, and a hearing was held on June 24, 1986. We thereafter issued an Order granting the motion; the preliminary injunction remains in effect at this time.

At the hearing, the Court directed the parties to submit cross-motions for summary judgment with comprehensive supporting briefs not to exceed 15 pages [3] on or before July 22, 1986. The Court directed that responses be filed on or before August 6, 1986. The Motions have been fully briefed.

## II. This Court's Authority to Review

Defendants urge the Court to decline to review the validity of the participation agreement because the agency's actions are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). We disagree. The issues presented are clearly appropriate for judicial review.

■ Review of agency action initiated by aggrieved persons "will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress". *Bowen v. Michigan Academy of Family Physicians,* —— U.S. ——, ——, 106 S.Ct. 2133, 2135–36, 90 L.Ed.2d 623 (1986); *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1510, 18 L.Ed.2d 681 (1967); *Modine Manufacturing Corp. v. Kay,* 791 F.2d 267, 270 (3d. Cir.1986); *Sherman College of Straight Chiropractic v. U.S. Commissioner of Education,* 493 F.Supp. 976 (D.D.C.1980). The presumption favoring judicial review of administrative action can be overcome only by a clear showing of explicit or implicit Congressional intent to preclude review. *In re Smith & Wesson,* 757 F.2d 431, 434–35 (1st Cir.1985); *Natural Resources Defense Council, Inc. v. Securities and Exchange Commission,* 606 F.2d 1031 (D.C. Cir.1979). The federal agency seeking to preclude judicial review has the burden to establish nonreviewability by clear and convincing evidence. H.R.Rep. No. 1980, 79th Cong., 2d Sess., 41 (1946) (comments of Committee on the Judiciary of the House of Representatives during debates which led to passage of the APA). *See also Bowen, supra.,* —— U.S. at ——, 106 S.Ct. at 2135; *National Corn Growers Association v. Bergland,* 471 F.Supp. 1199 (S.D.Iowa 1979), *appeal dism'd,* 611 F.2d 730 (8th Cir.1980), *vacated in part on other grounds,* 484 F.Supp. 1342 (S.D.Iowa 1980); *City of Camden v. Plotkin,* 466 F.Supp. 44 (D.N.J.1978).

Congressional intent to preclude judicial review may be implied if the agency action

---

3. Despite the parties' knowledge of the Court's intent in setting a 15–page limit on the briefs, they have included by reference in their numerous arguments contained in the preliminary injunction pleadings. The procedural posture of the case is significantly different now than it was during the preliminary injunction phase. Reference to the preliminary injunction pleadings is only marginally helpful. In the future, we request that counsel submit pleadings which comply with page limitations as established by the Court, and do not include wholesale incorporation of earlier pleadings.

is taken pursuant to a statute "drawn in such broad terms that in a given case there is no law to apply".[4] *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971). *See also Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). Statutes of such character are rare. *Citizens to Preserve Overton Park*, 401 U.S. at 410, 91 S.Ct. at 820 (1971); *Rank v. Nimmo*, 677 F.2d 692 (9th Cir.), *cert. denied*, 459 U.S. 907, 103 S.Ct. 210, 74 L.Ed.2d 168 (1982). Whether an agency decision is judicially unreviewable under 5 U.S.C. § 701(a)(2) depends on the spirit of the legislation, the wording from which we glean legislative intent, and pragmatic considerations. A Court must analyze the need for judicial supervision to safeguard plaintiffs' interests, the impact of review on the effectiveness of the agency, and the appropriateness of the issues raised for judicial review. Finally, the Court must balance whether overall considerations in favor of nonreviewability are compelling enough to rebut the strong presumption that agency action is reviewable. *Natural Resources Defense Council, Inc. v. Securities and Exchange Commission*, 606 F.2d 1031 (D.C.Cir.1979).

■ The issues presented to the Court in this action are properly subject to judicial review. As we indicated in our Order of June 30, 1986, significant and important interests are at stake. The care, treatment and future health of many program benefi-

ciaries may well be affected by implementation of the new participation agreement. Exhibits and Declarations submitted in support of the Motion for Preliminary Injunction are strong evidence of the impact the proposed changes would have on the CHAMPUS public. *See* Exhibit N, Hardin Declaration and Colburn Declaration in support of Motion for Preliminary Injunction, filed June 6, 1986. We are not dealing with general medical hygiene, which is likely readily available in most communities and circumstances, but with medical services which are often difficult to obtain. An agency's compliance with procedural mandates, especially when the results would likely have broad-ranging impact on the public, is precisely the type of issue which must be subject to judicial review.[5] Decisions which may affect the operation of a governmental aid program, when those decisions are not merely managerial in nature, must be reviewable. Moreover, the effect of judicial review of the agency action here will not significantly hamper the agency's effectiveness or flexibility. The agency decisions here are not of the type which have traditionally been held unreviewable as "committed to agency discretion by law". *See, e.g., Curran v. Laird*, 420 F.2d 122 (D.C.Cir.1969) (Secretary of Defense's decision to use particular vessels to ship military supplies nonreviewable); *Chicago & Southern Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948) (President's decision to

---

**4.** If there is an *express* Congressional intent to preclude judicial review in the agency's underlying organic act, our power to hear this action is foreclosed. *Block v. Community Nutrition Institute*, 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). However, neither party claims that such an express legislative prohibition exists; nor have we found such a provision in our review of the statute.

**5.** While our disposition of the procedural issues obviates the necessity to address the substantive issues, defendants' argument that the provisions of the participation agreement are not substantively reviewable is worthy of note. They argue in part, by incorporation from their previous briefs, that free market providers are often unable to convince purchasers to accept their set prices, and that free market pricing decisions are not judicially reviewable. Defendants are of course correct; but their point is not applicable

here. Government-provided services, the provision of which is controlled by legislation, do not operate in a purely free market context. The public interest and the public fisc are at stake. The government is well aware that it must be held accountable to the persons it represents. An important vehicle of that accountability is judicial review of the implementation of legislatively created government services. Citation of *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127, 60 S.Ct. 869, 876, 84 L.Ed. 1108 (1940) is not helpful. In that case, the government was a purchaser of services, not a provider of benefits. It is of course well-established that the government often operates as a private entity when competing as a purchaser in the private market. Here, however, the government is providing public benefits, pursuant to statute enacted by voter representatives.

approve or modify CAB's grants of air routes to foreign countries nonreviewable). As such, we find that the issues presented are properly before the Court at this time.

## III. Procedural Validity of OCHAMPUS' Actions

Plaintiffs claim the changes in the participation agreement constitute a rulemaking. They argue the Agency did not substantially comply with the rulemaking requirements of the APA. Defendants counter that the changes do not constitute a rulemaking, that the contracts exemption to the rulemaking requirements is applicable, and that in any event, they did in fact substantially comply with the APA's requirements. We find the changes instituted by OCHAMPUS were subject to the rulemaking requirements of the APA, the contracts exemption is inapplicable, and the Agency did not substantially comply with the APA requirements.

> Under 5 U.S.C. § 551(4), a rule
>
> ... means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefore or of valuations, costs, or accounting, or practices bearing on any of the foregoing....

The definition of a rule under the APA appears quite broad. However, judicial construction has significantly restricted the language of Section 551(4).[6] As the definition indicates, APA "rules" are characteristically of general applicability, and are prospectively effective. Rulemaking action by an agency generally does not apply previously set standards or policies to past facts or situations, but establishes a new standard or policy to apply to future facts. Rulemakings impose obligations on or affect groups, not only isolated persons. Agency rules implement or prescribe law or policy. *See PBW Stock Exchange, Inc. v. Securities and Exchange Commission,* 485 F.2d 718, 731–33 (3d. Cir.1973), *cert. denied,* 416 U.S. 969, 94 S.Ct. 1992, 40 L.Ed.2d 558 (1974); *American Export Co. v. U.S.,* 472 F.2d 1050, 1055–56 (C.C.P.A. 1973); *In re: FTC Corporate Patterns Report Litigation,* 432 F.Supp. 291, 301–04 (D.D.C.1977), *aff'd,* 595 F.2d 685 (D.C.Cir. 1978). Agencies fill the interstices in a statutory scheme by rulemaking action. *New England Telephone and Telegraph Co. v. Public Service Co. of Maine,* 742 F.2d 1, 4–6 (1st Cir.1984); *Precious Metals Associates, Inc. v. Commodity Futures Trading Comm'n,* 620 F.2d 900, 911–12 (1st Cir.1980). *See also McKenzie v. Bowen,* 787 F.2d 1216, 1222 (8th Cir.1986) (legislative rules fill gaps in statutes which grant broad agency discretion; interpretive rules not subject to APA rulemaking requirements merely clarify or explain existing law).

We are convinced OCHAMPUS' prescription of the contents of future participation agreements constituted a rulemaking. Defendants do not dispute that the proposed agreement changes the methods of and standards for reimbursement of RTCs. They urge us to conclude the proposals apply only to RTCs which choose to sign a participation agreement.[7] Imple-

---

**6.** We note, for example, that the reference in 5 U.S.C. § 551(4) to statements of "particular applicability" was designed by Congress to preserve the traditional understanding that ratemaking proceedings are to be regarded as rulemakings. *See, e.g., Long Island R.R. Company v. United States,* 318 F.Supp. 490 (S.D.N.Y.1970). The language was not intended to expand the APA definition of "rule" well beyond the usual meaning of the remainder of Section 551(4).

**7.** Interestingly, defendants neglect to note in this context that RTC participation in the CHAMPUS program, an important government benefit for employees of the Uniformed Services and surely an admirable service to provide for a community, is expressly *conditioned* on signature of such an agreement. 32 C.F.R. § 199.-12(b)(v)(*4*). To argue the action will have little effect if few entities choose to take part, and that the action is therefore not a rulemaking, is specious. Additionally, we note that as discussed in footnote 5, *supra,* it appears that the government envisions itself here as some sort of a private marketer of public services—when in

mentation of a single participation agreement, they argue, would not constitute a rulemaking. Defendants miss the point. Plaintiffs here do not challenge implementation of an isolated participation agreement, but instead challenge OCHAMPUS' creation of a policy applicable to *all* participation agreements. Significantly, plaintiffs do not challenge an isolated assessment of benefits,[8] but instead challenge OCHAMPUS action which will affect *many* future assessments. As we found in our Order of June 30, 1986, the proposed changes will have significant effects on treatment of CHAMPUS patients. *See National Association of Psychiatric Treatment Centers v. Weinberger*, Civil Action No. 86–F–1024, slip op. at 9–10 (D.Colo. June 30, 1986). *See, also*, Exhibit N, the Hardin Declaration, and the Colburn Declaration in support of the Motion for Preliminary Injunction filed June 6, 1986. We note that when an agency action has the characteristics of a rule, the fact that the action may impact specific individuals or situations does not alter the applicability of the APA's rulemaking requirements. *Bunny Bear, Inc. v. Peterson*, 473 F.2d 1002 (1st Cir.1973). Where, as here, an agency takes action which prospectively affects calculation and payment of Congressionally established benefits, rulemaking requirements are applicable.[9]

We also agree that the contract exemption from rulemaking requirements is not applicable. The general rulemaking provision of the APA, 5 U.S.C. § 553, delineates several exemptions from the general rulemaking requirements that the public be given notice and an opportunity to comment. The exemptions give agencies discretion to determine how much public participation, if any, will be permitted before a final rule is issued. Section 553(a) exempts

all rulemakings relating to "a military or foreign affairs function" or to "agency management or personnel, or to public property, loans, grants, benefits, or contracts." The policy behind the contract exemption is somewhat unclear. It appears the "public contracts" exemption was developed to avoid applying the notice provisions to certain minimum wage determinations by the Department of Labor. S.Doc. 248, 79th Cong., 2d Sess. 17–18 (1946).

The Senate Judiciary Committee report on its version of the APA commented that "[i]t should be noted ... that the exceptions apply only 'to the extent' that the excepted subjects are directly involved." S.Rep. 752, 79th Cong., 1st Sess. 13 (1945). Under this rationale, we find the contracts exemption should be construed strictly, and does not apply here. At issue are the Agency's prescriptive changes in overall contents of all participation agreements— which amount to policy changes of significant import. Judicial construction of the contracts exemption as it applies to a Housing and Urban Development Annual Contributions Contract are not persuasive authority to the contrary. The statutory basis for a HUD contract is quite different than the CHAMPUS system; the express policy behind low income housing is to delegate as much authority as possible to local officials. *See Vandermark v. Housing Authority of City of York*, 492 F.Supp. 359 (M.D.Pa.1980), *aff'd*, 663 F.2d 436 (3d. Cir. 1981). Here, on the other hand, the statutes, as well as the regulations implementing them, exhibit a concern for public input into many aspects of CHAMPUS operation. *See, e.g.,* 32 C.F.R. § 199.4(a). As such, we find Section 553(a)(2) does not justify OCHAMPUS' failure to comply with APA rulemaking requirements.[10]

---

fact provision of the services has been dictated by Congress, and the public interest is at stake.

**8.** *See, e.g., Prindle v. United States*, 5 Cl.Ct. 493 (1984).

**9.** We do not agree that the limited notice of changes provided by the Agency establishes that the agency's action constituted a rulemaking. Election to follow rulemaking procedures is not definitive. *See, e.g., Washington Hospital Center*

*v. Heckler*, 581 F.Supp. 195 (D.D.C.1984). Our determination that rulemaking procedures must be followed here rests on other grounds.

**10.** Although it is unnecessary, in light of the above, to address plaintiffs' argument that 32 C.F.R. § 199.4(a) effects a waiver of the contract exemption, that argument could well form an independent ground for our decision. Even if that Section does not waive all application of

■ Lastly, defendants' argument that the Agency substantially complied with the rulemaking requirements merits only brief comment. As we indicated in our Order of June 30, 1986 granting plaintiffs' motion for preliminary injunction, we find it significant that there was no public notice of certain specific provisions until October, 1985—fully five months after critical dates used to determine reimbursement amounts. *See* fn. 2, supra. To conclude that defendants complied with the notice provisions of the APA in this situation would be to abrogate the purpose of the provisions. Certainly, the interested public must have an opportunity to respond to the substance of pivotal Agency actions. Notice of generalities alone will not suffice.

Also, the basis and purpose statement in the Federal Register notice provided by the Agency is inadequate. Such a statement is critical to effective judicial review. *Home Box Office v. Federal Communications Commission,* 567 F.2d 9, 35–36 (D.C.Cir.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89, *reh. den.,* 434 U.S. 988, 98 S.Ct. 621, 54 L.Ed.2d 484 (1977). Defendants evidently argue that the Declaration of defendant Teresa Hawkes, submitted to the Court on July 15, 1986, should suffice as a basis and purpose statement. However, a *post hoc* submission cannot cure the absence of a sufficient statement provided in compliance with the APA. *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983); *St. James Hospital v. Heckler,* 760 F.2d 1460, 1469–70 (7th Cir.1985); *Walter O. Boswell Memorial Hosp. v. Heckler,* 749 F.2d 788, 792–94 (D.C.Cir.1984).

### IV. Conclusion

ACCORDINGLY, plaintiffs' Motion for Summary Judgment is GRANTED, and defendants' Motion for Summary Judgment is DENIED. The Agency is enjoined from proceeding without compliance with the spirit and tenor of this Order. OCHAM-

the contracts exemption to CHAMPUS actions, Section § 199.4(a) may apply specifically to the situation at hand; this Court would be hard-pressed to imagine many Agency actions which

PUS may proceed in compliance with the rulemaking requirements of the Administrative Procedures Act. The parties are to bear their own costs.

would have a more "substantial and direct impact" on the CHAMPUS public than the changes challenged here.