ARKANSAS PHARMACIST'S ASSOCIATION, INC.,
Sunnymede Pharmacy, Inc., Bryant's Investments and Holding, Inc.,
Sims Drug, Inc., Gary Fancher, P.D., d/b/a Flippin Pharmacy *v.*
ARKANSAS STATE and PUBLIC SCHOOL LIFE and HEALTH
INSURANCE BOARD, Arkansas Department of Finance
and Administration — Employee Benefits Division,
and Advance PCS, Inc.

02-929                                                     98 S.W.3d 27

Supreme Court of Arkansas
Opinion delivered February 13, 2003

2

*The Health Law Firm*, by: *Harold H. Simpson* and *Seth Ward III*, for appellants.

*Barber, McCaskill, Jones & Hale, P.A.*, by: *Robert L. Henry III*, *Michael Emerson*, and *D. Keith Fortner*; and *Steptoe & Johnson, LLP*, by: *Martin Schneiderman*; and *Mark Pryor*, Att'y Gen., by: *Patricia Van Ausdall Bell*, Ass't Att'y Gen., for appellees.

Tom Glaze, Justice. This case requires us to determine whether certain actions of the Arkansas State and Public School Life and Health Insurance Board constituted rule-making and whether those actions had to be taken in accordance with the

Arkansas Administrative Procedures Act, Ark. Code Ann. § 25-15-201 *et seq.* (Repl. 2002).

Appellee State and Public School Life and Health Insurance Board (Board) is a statutorily created board that sets policy and selects plans and coverages for the state employee and public school personnel health and life insurance and self-funded medical programs. Ark. Code Ann. § 21-5-401 (Supp. 2001). Appellee AdvancePCS Health, L.P. (APCS) provides pharmacy benefits management services for health-benefit plans. The Employee Benefits Division of the Arkansas Department of Finance & Administration (the Division) contracts for health and life insurance coverage on behalf of state and public school employees; the Division also provides state and public school employees with prescription benefits through APCS.

On March 1, 2001, APCS's predecessor, Advance Paradigm, entered into a contract with the Division to provide pharmacy benefits management services for State and public school employees. Under this benefit services contract, prescription drug purchases by state and public school employees are covered under the plan if the purchases are made at APCS network pharmacies. The network is a group of pharmacies that have contracted with APCS to provide pharmacy services to state and public school employees covered by the plans and to receive reimbursements according to a specific formula. The appellants in this case — the Arkansas Pharmacist's Association, Sunnymede Pharmacy, Bryant's Investments and Holding, Sims Drug, Inc., and Gary Fancher, P.D., d/b/a Flippin Pharmacy — alleged they were participating pharmacies in the APCS pharmacy network.

After reviewing various proposals regarding changes to the pharmacy benefit services agreement, the Board recommended two changes to the Division's and APCS's agreement at an October 17, 2001, board meeting. First, the Board passed a motion to recommend the implementation of an optional mail service to state and public school employees, whereby certain prescriptions could be filled through the mail. Second, the Board moved to recommend a change in the rate at which pharmacists were reimbursed. Discussions at the board meeting indicated that changing

the reimbursement rate could save the State about $5 million annually. On January 17, 2002, the Division and APCS executed an amended agreement incorporating the Board's recommended changes to the reimbursement rates and the mail-order service; the amended agreement also extended the term of the agreement until December 31, 2002.

The Arkansas Pharmacist's Association, Inc.,[1] and the pharmacies named above (collectively referred to as the Association) filed a declaratory judgment action against the Board and, by way of an amended complaint, included the Division and APCS as defendants. The complaint alleged that, in making the recommendations at the October 17 meeting, the Board engaged in rule-making within the meaning of the Arkansas Administrative Procedures Act, Ark. Code Ann. § 25-15-201 (Repl. 2002) (APA). Further, the complaint alleged that the Board failed to comply with the notice and hearing provisions of the APA, and as a result, the "rules" should be declared invalid.

The opposing parties filed cross-motions for summary judgment. After a hearing on May 16, 2002, the trial court granted the summary-judgment motion filed by the Board, the Division, and APCS, and denied the Association's motion. The trial court held that the Board's actions at its October 17 meeting, recommending the mail order provision and lower reimbursement rates, were not "rules" or "rule making" under the APA; it also determined the Division's and APCS's conduct in adopting these two recommendations by amending their contract did not constitute "rules" or "rule making." From the trial court's order granting summary judgment in favor of the Board, the Division, and APCS, the Association brings this appeal.

■■ For its first point on appeal, the Association argues that the trial court erred in finding that the Board's action did not constitute rule-making. Under the Administrative Procedures Act, a "rule" is defined as "any agency statement of general applicability and future effect that implements, interprets, or prescribes

---

[1] The Arkansas Pharmacist's Association is a non-profit corporation that represents pharmacists throughout the State. Initially, a fifth pharmacy, Yellville Drug Store, Inc. d/b/a Clinic Pharmacy, had joined in this litigation.

law or policy, or describes the organization, procedure, or practice of any agency and includes, but is not limited to, the amendment or repeal of a prior rule." Ark. Code Ann. § 25-15-202(8)(A) (Repl. 2002). Moreover, the APA defines "rule making" as meaning an "agency process for the formulation, amendment, or repeal of a rule." § 25-15-202(9). The Association asserts that the Board's decision to amend the pharmacy benefit services agreement between the Division and APCS amounted to "rule making."

In support of its argument, the Association asserts that the Board's actions were indisputably of "future effect" and amounted to a prescribing of policy; the "only dispute," according to the Association, is whether the Board's actions were "of general applicability." The Association insists that the Board's decision was of general applicability, because the amendment 1) changed the reimbursement formula for all current and future pharmacies that provide services to plan members, and 2) offered the mail order benefit to all current and future members.

■ ■ The Association is in error on this point. The only Arkansas case that discusses the meaning and import of "general applicability" within the framework of the APA is *Eldridge v. Board of Correction*, 298 Ark. 467, 768 S.W.2d 534 (1989). In that case, Steve Eldridge brought suit for declaratory and injunctive relief challenging the site selection for an adult detention facility by the Department of Correction; Eldridge claimed that the Department failed to comply with the notice and hearing provisions of the APA. The trial court granted summary judgment in favor of the Department, finding that the site-selection decision did not constitute the adoption of a rule. In affirming the trial court, this court held as follows:

> Eldridge strongly argues that the decision by the Department of Correction to establish an adult detention facility is a statement of general applicability that implements the law authorizing the Department to establish such facilities. While this construction perhaps involves an interesting argument in semantics, *the action of the Department was no more than the carrying out of legislatively mandated administrative duties* under section 12-27-103 and

not the adoption of a rule within the meaning of section 25-15-202(4) and (5).

Here, the term "rule" has been defined for us, and subsections (4) and (5) of section 25-15-202 were obviously drafted to address those instances in which an agency subject to the Act either formulates, amends, or repeals statements of general applicability and future effect which implement, interpret, or set out provisions having legal consequences, or which describe departmental policies, or explain the organization, procedure, or practice of an agency. Our first rule of construction as to the language of any piece of legislation is to construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Bolden v. Watt*, 290 Ark. 343, 719 S.W.2d 428 (1986). Site selection for the construction of an adult detention facility does not fall anywhere within the definition of the term "rule" as contained in the Act, if for no other reason than that it does not constitute an agency statement of general applicability.

*Eldridge*, 298 Ark. at 470-71 (emphasis added).

It is clear from *Eldridge* that a state agency can carry out its statutorily appointed day-to-day tasks without every action being considered an exercise in "rule making." In *Eldridge*, this court noted that the Department of Correction had the "function, power, and duty . . . to establish and operate regional adult detention facilities." *Id.* at 470. Similarly, in the instant case, the Board is statutorily charged with the following powers, functions, and duties:

(1) *To explore various cost containment measures and funding options*;

\* \* \* \*

(6) To evaluate responses to requests for proposals, select contractors for all services, approve the award of contracts resulting from bids for all health and life insurance offerings for participants of the various plans;

\* \* \* \*

(8) *To promote increased access to various health plan options and models*;

(9) *May, at the discretion of the board, direct the Office of State Purchasing to contract with all qualified vendors,* as defined by the board, *offering the health benefit plans* prescribed by the board without regard to § 19-11-228 or other statutes requiring competitive bidding.

§ 21-5-404 (emphasis added).

■ In making its recommendations, the Board was exploring various cost-containment measures, in that it determined that changing the reimbursement rate would save up to $5 million annually. In addition, it was promoting increased access to various health-plan options and models, by deciding to offer the mail-service option to its members.

As to the question of whether the Board's actions were of "general applicability," the Association attempts to distinguish *Eldridge* on the basis that the issue in that case "only concerned the specific location in which the agency decided to build a single, specific adult detention facility." Because the decision in *Eldridge* was of "particular applicability," to use the Association's phrase, it did not constitute rule making. Here, however, the Association asserts that the Board's decisions are of future effect, and act on unnamed and unspecified pharmacies and plan members, and are therefore of "general applicability."

■ However, it is difficult to conclude that the Board's recommendations to the Division were of "general applicability," because these recommendations were of no effect until the Division and APCS negotiated and executed the terms of their amended contract. Moreover, the record reveals that the Board's recommendations impacted only the Division's contract with APCS for a limited time, ending on December 31, 2002. Obviously, as in *Eldridge,* the action of the Board was "no more than the carrying out of legislatively mandated administrative duties under section [21-5-404,] and not the adoption of a rule within the meaning of [the APA]." *See Eldridge,* 298 Ark. at 471.

Bearing on this point, Ark. Code Ann. § 21-5-406 (Supp. 2001) sets out that the Board must choose an executive director with the approval of the executive director of the Department of Finance & Administration (DF&A), and the selected director is

located in the Employment Benefits Division of DF&A. The Board's executive director is charged with the duty to administer the Board's day-to-day functions, and this includes having the authority to supervise the implementation and day-to-day management of the health insurance programs and other employee benefit programs and plans.

■ In the present case, due to information provided to the Board, the Board approved motions that led its executive director to renegotiate the Division's contract with APCS, so state and public school employees had an option for mail-order pharmacy services, in addition to overall plan savings by lowering the rate of reimbursement to network pharmacists. This action falls entirely within the statutorily mandated duties of the Board, and the trial court did not err in concluding that the Board's conduct did not amount to rule-making within the meaning of the APA.

■ We note that the Association refers to four cases from other jurisdictions, but we believe the *Eldridge* decision and our court's interpretation of Arkansas's APA rule and rule-making provisions are sufficient to decide the situation before us. We also conclude those decisions relied on by the Association are inapposite or distinguishable. For instance, the Association cites *National Association of Psychiatric Treatment Centers for Children v. Weinberger*, 658 F. Supp. 48 (D. Colo. 1987), wherein the federal district court addressed the failure of the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS) to provide notice about proposed changes in participation agreements that affected every participating treatment center within the CHAMPUS plan. There, the court noted that the challenge was not to the implementation of a single participation agreement, but instead was directed at CHAMPUS's creation of a policy applicable to all participation agreements. *Weinberger*, 658 F. Supp. at 54. Here, on the other hand, there is only one agreement, and the Board's proposed changes were negotiated and agreed upon by the parties to that contract; there was no unilateral imposition of the changes, as there was in *Weinberger*.

■ Next, the Association cites *Failor's Pharmacy v. Department of Social & Health Services*, 886 P.2d 147 (Wash. 1994). There,

the issue was whether a decision by the Washington State Department of Social and Health Services to unilaterally alter the state's Medicaid reimbursement payment schedules to prescription drugs constituted rule-making under that State's APA. The Washington Supreme Court held that it did, because the reimbursement schedules "constituted an order, directive, or regulation of general applicability relating to a benefit conferred by law." *Failor's Pharmacy*, 886 P.2d at 494. Because the reimbursement schedules were uniformly applied to all members of the class of Medicaid prescription providers, it was generally applicable. Unlike the *Failor's Pharmacy* decision, the case before us involved the Board's recommendations to amend a single pharmacy benefit services contract.

The Association also cites *Senn Park Nursing Center v. Miller*, 470 N.E.2d 1029 (Ill. 1984), for its statement that an amended "inflation-update procedure" was an agency statement of general applicability because it "does implement a policy of the agency and is not a statement dealing only with the internal management of the agency. The rule does affect the rights and procedures available to people outside the agency." *Senn Park*, 470 N.E.2d at 178. But again, as in *Failor's Pharmacy*, the amended procedure was a unilateral alteration to a state Medicaid plan that affected every nursing home facility that participated in the Medicaid program. *See also, NME Hospitals, Inc. v. Department of Social Services*, 850 S.W.2d 71 (Mo. 1993) (wherein the Missouri Supreme Court held that a change to the formula used to reimburse Medicaid mental health provides was of "general applicability," and that court held that the amended formula was a rule of general applicability because the Medicaid reimbursement policy applied generally to all participants in the Medicaid program, and because "[d]efinition of the reasonable costs, manner, extent, quantity, quality, charges, and fees of medical assistance under the program *must be made by rule and regulation*" under Rev. Stat. Mo. § 208.153.1). *NME Hospitals*, 850 S.W.2d at 74.[2]

Before leaving this point, we would be remiss to fail to mention APCS's out-of-state cases that can be said to sup-

---

[2] Because the changes were required to be made by rule, the concerns presented in the Missouri case are different from the instant situation.

port its position that the amended agreement APCS entered into with the Division did not constitute a rule. For example, in *Alabama Department of Transp. v. Blue Ridge Sand & Gravel, Inc.*, 718 So.2d 27 (Ala. 1998), the court held that certain amended standard specifications were not "rules" within the context of Alabama's APA, but were rather only specifications for engineering details and materials that may be incorporated by reference into a request for bids for highway construction contracts. The *Blue Ridge* court further stated that the specifications did not describe the organization, procedure, or practice requirements of the Department of Transportation or constitute a regulation of general applicability, but were simply terms that could be incorporated into a contract between the Department and some other party. APCS also referred to *Alca Industries, Inc. v. Delaney*, 686 N.Y.S.2d 356 (1999), where that court declined to hold that bid-withdrawal procedures were rules, because "[c]hoosing to take an action or write a contract based on individual circumstances is significantly different from implementing a standard or procedure that directs what action should be taken regardless of individual circumstances; rule making, in other words, sets standards that substantially alter or, in fact, can determine the result of future agency adjudications"; *see also Dep't of Health & Mental Hygiene v. Chimes, Inc.*, 681 A.2d 484 (Md. Ct. App. 1996) (institution of cost containment measures did not constitute a rule because it did not change existing law, formulate new rules of widespread application, or apply new standards retroactively to the detriment of an entity that had relied upon the agency's past pronouncements; rather, the "growth cap" applied only to a limited number of providers in their capacity as contractors with a state agency pursuant to contracts between the parties subject to termination by either side, and applied only in a particular program), and *Dep't of Transp. v. Blackhawk Quarry Co. of Florida, Inc.*, 528 So.2d 447 (Fla. Dist. Ct. App. 1988) (standard contract specifications for building materials did not qualify as rules because they were "more in the nature of a contract term between the contractor and the [Department of Transportation] as opposed to a rule"). In sum, we hold that the trial court was correct in ruling that the Board's actions in this matter did not constitute rule making.

For its second point on appeal, the Association contends that Paragraph 4 of the trial court's order is erroneous "in that the amendment of the contract between the Division and APCS does not establish the terms and conditions of the plan." That paragraph reads as follows:

> The conduct of defendants in establishing the mail order provisions and lower reimbursement rates by amending the [pharmacy benefit management] contract between the Division and APCS do not constitute "rules" or "rule making" under the [APA].

Although the court's order does not mention the word "plan," the Association argues in its brief that this statement is in error because it "assumes that the terms and conditions of the *Plan* are governed by the contract between the Division and APCS." The Association asserts that the Board, as a policy-making body, modified the "Plan" when it made its recommendations on October 17, 2001, and this action constituted the adoption of a new policy to amend the health benefits plan offered to employees. The Association further contends that, since the APA rule-making procedures were not followed, the amendment to the "Plan" was invalid. In support of its argument, the Association cites § 21-5-401, which provides for the Board's creation and states that the Board is to "set policy and select plans and coverages for the state employee and public school personnel health and life insurance and self-funded medical programs."

The Board responds that it did not adopt a new policy or amend any "Plan" because there was no "Plan" to amend. Instead, as previously discussed, the Board merely recommended an amendment to an existing contract between the Division and APCS, and there was no independent or separate "Plan," as now alleged by the Association. The evidence clearly supports the Board's position.

It should be noted that the Association does not refer to any document it claims to be a "Plan," and, while the Association refers to certain testimony in support of its suggestion that such a "Plan" exists, the Association never makes clear exactly what the "Plan" contains, where it is located, or what it sets out. Further, although the Association points to snippets of testimony from the

current and immediate past executive directors of the Division and from the chairman of the Board, this testimony, taken as a whole, does not support the Association's conclusions.

For example, John Greer, the former executive director of the Division, was asked whether there is "a written plan providing for prescription drug benefits for state employees and public school teachers"; he responded, "I would answer no, and I don't know of any plan existing anywhere that has a written plan for pharmacy and health or life benefits." Similarly, Sharon Dickerson, the current executive director of the Division, testified that "[t]here is not a document, *per se,* not one document." Rather, she stated, "[t]he plan consists of the drugs that are on the formulary. . . . The plan consists of the relationship between the — APCS and [the Division] as related to the performance guarantees. The plan is the pre-op, the quality versus time, the step therapy, you know, the reimbursement, the claims payment. You know, it's — the whole thing is the plan."

The Association also refers to the testimony of John Hartnedy, the chairman of the Board, who said that it was Board policy to determine the benefits of the plan. Hartnedy also averred that DF&A required action by the Board before the reductions in pharmacy reimbursement rates could take place and before the mail-order program could be implemented. However, Hartley's testimony never revealed what the plan was or where it was set out.

In sum, no independent, overarching "Plan" was developed by Hartnedy's, Greer's, or Dickerson's testimony. Instead, the testimony and evidence clearly supports a conclusion that the prescription drug benefits plan offered to Arkansas state and public school employees consists of the terms and conditions of the pharmacy benefits management contract, not some independent "Plan" developed and ordered by the Board. The trial court did not err in granting summary judgment in favor of the Board, the Division, and APCS. Therefore, we affirm.