The Alabama Department of Transportation and a number of its officials and employees, who were defendants in the circuit court, appeal from a preliminary injunction. The circuit court's injunction has the effect of prohibiting the use of the Department's "Standard Specifications for Highway Construction" unless and until those specifications are adopted as rules pursuant to the Alabama Administrative Procedure Act ("AAPA") Ala. Code 1975, § 41-22-1 to -27. We conclude that the injunction should be dissolved and the case remanded.
The plaintiffs, Blue Ridge Sand and Gravel, Inc., and Bob Estes, sought, among other relief, a preliminary injunction against the Department's implementation of amendments to §§ 801.01 (a), 801.03 (a), and 802.06 of the standard specifications and supplemental specification 4-92 (2). These amendments and the supplemental specification require that gravel for use in hot mix asphalt for roads and in the superstructure of bridges "shall have a bulk specific gravity greater than 2.550." The plaintiffs contend that each of these amendments to the standard specifications is a "Rule" as that term is defined in §41-22-3 (9), so that the rulemaking provisions of the AAPA, especially §§ 41-22-4, -5, and -23, apply to the promulgation of the amendments. The plaintiffs contend that, because the Department did not comply with those provisions, it cannot use the amended standard specifications in any highway construction contract. Blue Ridge quarries and sells gravel made from chert, which has a specific gravity less than 2.550.
The Department presented evidence indicating that it adopted the 2.550 standard after experiencing premature failures of road surfaces and bridges with gravel made from chert. Larry Lockett, a materials and test engineer with the Department who had authority in this matter, testified:
 "Q. Do you know why the Department of Transportation adopted the bulk specific gravity specification for coarse gravel?
 "A. To prevent the use of chert gravels in hot asphalt and bridge decks. *Page 29 
 "Q. All right. Do you know why the Department of Transportation wanted to eliminate the use of chert gravel in hot mix asphalt and bridge decks?
 "A. Poor pavement performance in hot mix and poor bridge performance in bridge decks.
 "Q. When , you say `poor performance,' would you please explain what you mean?
 "A. A large, a very high, an unusually high occurrence of failure due to stripping of the asphalt off the aggregates in the hot mix and we would have — when the gravel would absorb moisture and freeze in bridge decks, we would have pop-outs. It would look like a divot on a golf course in the bridge deck.
 "Q. You mean a chunk coming out? Is that what you mean?
"A. Yes.
"Q. Is rutting a problem also?
 "A. When stripping starts at the underlying layers, you lose some support, and the surface ruts — you have permanent deformation due to that lack of support.
 "Q. Do you know why [the 2.550 specific-gravity specification was used]?
 "A. It was made at the direction of the Federal [Highway] Administration to be able to obtain federal funds."
Lockett also testified that the Department had experienced failures of asphalt pavements with chert gravel within 6 to 24 months, while the average life span of asphalt pavements is 12 years. Lockett said that he had been studying the problem for years and that the Department had done testing before it arrived at the 2.550 specific-gravity specification. Thus, the Department's evidence showed that its adoption of the 2.550 specific-gravity specification was an attempt to improve road and bridge longevity and to reduce maintenance costs.
The question is whether the standard specifications are "rules" within the meaning of § 41-22-3 (9), Ala. Code 1975. The Department argues that they are not., but that they for supplying gravel to the contractor. The contractor, are only, as they purport to be, specifications for engineering details and materials that may be incorporated by reference into a request for bids for highway construction contracts. Section 41-22-3 (9) defines "Rule" as "Each agency regulation, standard or statement of general applicability that implements, interprets, or prescribes law or policy, or that describes the organization, procedure, or practice requirements of any agency. . . ."
The standard specifications do not "describer the organization, procedure, or practice requirements of" the Department. Pursuant to the AAPA, the Department has adopted administrative rules that describe its organization, procedure, and practice requirements. See Alabama Administrative Code, Chapter 450-1-1 et seq.
Nor do the standard specifications constitute an "agency regulation, standard or statement of general applicability that implements, interprets, or prescribes law or policy." Rather, each of the specifications, including the amended specifications directly at issue here, is simply a term that may be incorporated into a contract between the Department and some other party. See generally § 41-16-27, Ala. Code 1975, which provides that, in accepting or rejecting competitive bids, an awarding authority may take into consideration "the qualities of the commodities proposed to be supplied, their conformity with specifications, the purposes for which required," and so forth. Ala. Code 1975, § 41-16-27(a) (emphasis added). If an unsuccessful bidder or another interested party[1] considers specifications for a given contract to be inappropriate, the competitive bid law provides a means for challenging the inclusion of those specifications. See § 41-16-31; White v. McDonald FordTractor Co., 287 Ala. 77, 248 So.2d 121 (1971). The fact that the Department has established standard specifications that it may incorporate by reference rather than setting forth all specifications in each highway construction contract does not elevate those specifications to the status of "rules." All interested parties seriously involved in highway *Page 30 
contracting and supplying materials know of these standard specifications, because the Department makes them available to the public.[2] See § 23-1-34; Chapter 450-1-1-.09 and450-1-2-.06, Ala. Admin. Code.
The Supreme Court of Michigan, in affirming the lower courts' holding that the Michigan highway department's standard specifications were not an agency rule subject to the Michigan Administrative Procedures Act, stated:
 "The 1970 Standard Specifications for Highway Construction are found in a bound volume of 735 pages. The specifications include definitions of terms, allocation of duties between the contractor and the state, payment terms, and hundreds of pages of highly technical and detailed information concerning construction methods and techniques, soil composition requirements, metal heat treating methods, and technical details touching almost every conceivable aspect of highway construction work for which the State of Michigan might contract. Relevant portions of the standard specifications . . . are routinely incorporated by reference in the Highway Department construction contracts not only to avoid the cumbersome necessity of reproducing the highly detailed information in every separate contract, but to enable prospective bidders upon state construction contracts to know in advance the bid requirements and construction specifications which will apply if they bid upon a state owned highway construction project.
 "It is undisputed that no part of the 1970 Standard Specifications for Highway Construction have ever been promulgated as agency rules within the meaning of . . . the Administrative Procedures Act . . . as a condition of their validity. It is likewise undisputed that the statutory steps preliminary to the adoption of agency rules, including publication of the proposed rule, and publication and transmission of notice of public hearing were never undertaken with respect to Sec. 1.04.03 (c) or any of the standard specifications.
 "We agree with the trial court and the Court of Appeals that Sec. 1.04.03 (c) of the 1970 Standard Specifications for Highway Construction is not an agency rule within the meaning of Sec. 7 of the Administrative Procedures Act. It is, as its title suggests, one of hundreds of standard contract terms and specifications governing the contractual relationship between the state and contractors engaged in highway work."
Greenfield Constr. Co. v. Michigan Dep't of State Highways,402 Mich. 172, 190-91, 261 N.W.2d 718, 722-23 (1978). Section 7 of the Michigan APA cited in Greenfield Const. Co. is very similar to the first part of § 41-22-3 (9) of the AAPA.
To like effect is Department of Transportation v. BlackhawkQuarry Co. of Florida, 528 So.2d 447 (Fla.Dist.Ct.App.), rev. denied, 536 So.2d 243 (Fla. 1988), which held that a standard specification similar to the one here was not a "rule" within the meaning of § 120.52 (16) of the Florida Statutes, which sets out an APA definition virtually identical to that in our §41-22-3 (9):
 "[S]ection 915 simply sets out specifications for acceptable coquina material as part of the comprehensive standards for state road and bridge construction. It is more in the nature of a contract term between the contractor and DOT as opposed to a rule."
528 So.2d at 450.
We agree with the Michigan Supreme Court and the Florida District Court of Appeal that such standard specifications are not "rules" within the purview of the Administrative Procedure Act.
Moreover, even if the Department of Transportation's Standard Specifications for Highway Construction might be considered "rules, " the evidence presented to the circuit court brings the amended and supplemental specifications within one or more exceptions to the AAPA's definition of "Rule." The definition in § 41-22-3 (9) of "Rule" states that a rule, for purposes of the AAPA, "includes *Page 31 
any form which imposes any requirement or solicits any information not specifically required . . . by an existing rule or by federal statute or by federal rule or regulation." The Department introduced evidence indicating that the adoption of the 2.550 specific-gravity requirement was required for the state to continue receiving federal highway money. In addition to the testimony quoted above, the Department submitted, in support of its motion to stay enforcement of the injunction, a copy of a letter from Joe D. Wilkerson, division administrator of the Federal Highway Administration, to the director of the Alabama Department of Transportation. That letter stated, in part:
 "We have expressed concern for some time regarding the poor performance of pavement utilizing porous gravels with high internal moisture. . . . I have given this problem serious consideration and have concluded that changes need to be made in the specifications before further authorization of projects for pavement construction utilizing these gravels."
By the terms of § 41-22-3 (9), the standard incorporated into § 801.01 (a) and the other amended and supplemental specifications is not a "rule" governed by the AAPA, because it is "specifically required . . . by federal rule or regulation."
In the chapters of the Code governing the operation of the Department of Transportation, there are many instances where the Department is given the authority to make agreements with, or otherwise to cooperate with, the Federal Government so as to facilitate the receipt of federal money for the construction of highways and bridges and for other reasons. See, e.g., §23-1-1, authorizing the Department to "enter into all necessary contracts and agreements with the United States government or any agency or officer thereof . . . and to do all other things necessary to secure to the state and its counties and municipalities the full benefits provided by [Congressional] acts"; § 23-1-57(4), regarding compliance with federal regulations when the Department enters an agreement regarding the construction of a bridge across a river forming a state boundary; § 23-1-170 et seq., especially -175(13), regarding the Alabama Finance Corporation; and § 23-1-300 et seq., creating the Federal Aid Highway Finance Authority. If the Department were required to implement rulemaking procedures each time the Federal Government changed its requirement for some aspect of road-building, the attendant delays, expense, and use of the time of Department employees could completely strangle the entire process of highway construction in this state. This shows that the exception in § 41-22-3 (9) for requirements imposed by federal rule or regulation is a reasonable exception to the definition of "Rule"; this further supports our conclusion that the injunction is due to be dissolved.
The Department of Transportation (formerly the Highway Department, see § 23-1-20, as amended) has maintained its standard specifications for many years. Indeed, a 1969 act of the legislature incorporated a portion of the standard specifications into the Alabama Code. Section 23-1-60, Ala. Code 1975, incorporates the portion of the standard specifications that give the director of transportation "authority to make, at any time during the progress of any construction on any highway project under his jurisdiction, such changes or alterations of construction details . . . as may be necessary or desirable for the successful completion of the project." From this section, it is clear both that the legislature was aware of the standard specifications well before it enacted the AAPA and that the legislature has given the director of transportation authority to modify the terms and conditions of highway construction EVEN during the progress of a particular project. It would be contradictory to conclude that the director can modify construction specifications during the work on a particular project without engaging in rulemaking procedures, but can modify such specifications before a contract is awarded only by rulemaking procedures.
The AAPA was adopted in 1981; see 1981 Ala. Acts, Act No. 81-855, p. 1534. The Department has adopted rules according to the provisions of the AAPA, pursuant to its rulemaking authority; see § 23-1-59. Those rules are incorporated into the Alabama Administrative *Page 32 
Code at Chapter 450-1-1 et seq., but they do not include detailed highway engineering requirements such as are included in the standard specifications. The record indicates that it has not been suggested until now that the Department's standard specifications should he adopted pursuant to rulemaking procedures of the AAPA. The AAPA gives the legislature oversight of administrative rulemaking, see § 41-22-2, -6, -22, and -23, but, in spite of its familiarity with the standard specifications, as evidenced by its enactment of § 23-1-60, and in spite of the significance of highway expenditures (one of the largest expenditures in the State budget), there is no indication that the legislature has ever questioned the absence of the standard specifications from the rules in the Administrative Code. This indicates a legislative intent that the standard specifications are not "rules" within the contemplation of § 41-22-3 (9) and the AAPA.
Chapter 450-1-2-.01(1) of the Departments Administrative Code states that "Any interested person may petition the Alabama Highway Department requesting the adoption, amendment, or repeal of a rule." See § 41-22-8, which requires each agency governed by the AAPA to adopt such a rule. The plaintiffs here have not shown that they requested the adoption of the amended specifications (or a less-strict version that would allow the use of their gravel) as "rules" within the contemplation of the AAPA. Furthermore, the plaintiffs did not avail themselves of the procedure for petitioning for a declaratory ruling provided by Chapter 450-1-2-.02. Because the Department has used its standard specifications for many years, both before and since the adoption of the AAPA, without any suggestion that they be adopted as rules, and because Estes and Blue Ridge Sand and Gravel made no request for a change in the amended specifications[3] or for a declaratory ruling by the Department, we conclude that they failed to exhaust their administrative remedies. See, e.g.,Mobile Gulf R.R. v. Crocker, 455 So.2d 829 (Ala. 1984); FraternalOrder of Police, Strawberry Lodge No. 40 v. Entrekin, 294 Ala. 201, 314 So.2d 663 (1975).
The circuit court's preliminary injunction purports to reach only the 1997 amendments at issue here, but its reasoning would reach the entire manual of standard specifications. The Department has published a 1992 edition and a 1995 edition of its standard specifications. The Department has, admittedly, made these revisions without engaging in rulemaking procedures. For all that appears, the entire set of standard specifications would be rendered void by the trial court's injunction.
A trial court 'will balance the probable resulting damages to the respective parties" when considering whether to issue a preliminary injunction. Woodstock Operating Corp. v. Quinn,201 Ala. 681, 682, 79 So. 253, 254 (1918); Martin v. First FederalSav. Loan Ass'n of Andalusia, 559 So.2d 1075, 1079 (Ala. 1990). "Loss of profits does not justify the issuance of an injunction."State Dep't of Public Safety v. Scotch Lumber Co., 293 Ala. 330,333, 302 So.2d 844, 846 (1974). The harm that Blue Ridge and Estes would suffer without the injunction is the loss of profits they might receive from selling chert to highway contractors for use in the construction of state roads and bridges. By contrast, the injunction harms the Department by requiring it to accept for highway and bridge construction a material that it has determined causes premature failure. The injunction may result in excessive costs in the repair or replacement of defective roads and bridges[4] and in the loss of federal highway *Page 33 
way money. Balancing the hardship the injunction imposes on the Department against the injury to the plaintiffs if the injunction is denied, we conclude that the balance of equities favors the defendants.
For the reasons stated, we conclude that the Department of Transportation's Standard Specifications for Highway Construction are not "rules" within the purview of the Alabama Administrative Procedure Act. The circuit court erred in entering the injunction prohibiting the defendants from incorporating the amended and supplemental standard specifications into highway and bridge construction contracts.
INJUNCTION DISSOLVED AND CASE REMANDED.
HOOPER, C.J., and MADDOX, SHORES, HOUSTON, and SEE, JJ., concur.
[1] Blue Ridge Sand and Gravel does not bid on contracts; it provides price quotes to contractor, if it plans to buy from Blue Ridge, then uses that quote to formulate its bid for the contract.
[2] This Court requested and received a copy of the Standard Specifications because the record did not include a full set of those specifications. The bound volume the Court received contains more than 600 pages of detailed specifications.
[3] Instead, they relied on § 41-22-10, which provides for a declaratory judgment action to determine "[t]he validity or applicability of a rule" and for injunctive relief.
[4] In support of its motion asking the circuit court to dissolve the injunction and its later motions in that court and this one for a stay, the Department submitted the September 4, 1997, affidavit of Dykes T. Rushing, the office engineer for the Department. Mr. Rushing stated that for the remainder of the year 1997 the Department planned to engage in bid lettings totalling $197,00,000. He stated: "A major portion of these projects involves plant mixed asphalt and bridge superstructures to which the Department's enjoined bulk specific gravity special provisions applied. Given the premature failure of road wear surfaces containing chert gravel, the Department will expend additional resources to repair or replace those surfaces contained within the above lettings if chert gravel is used in the plant mixed asphalt or concrete bridge decks. A conservative estimate of the cost of repair is 50% of the original cost of the projects or $98,500,000.00."