STATE OF MAINE

BUSINESS AND CONSUMER COURT

Cumberland, ss

Location: Portland
Docket No.: BCD-CV-14-050

BITUMAR USA INC.,

          Plaintiff,

v.

MAINE DEPARTMENT OF
TRANSPORTATION,

          Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

## ORDER ON PLAINTIFF'S EMERGENCY MOTION
## FOR PRELIMINARY INJUNCTION

Plaintiff Bitumar USA Inc. ("Bitumar") has filed a Motion for Emergency Preliminary

Injunction in this action for declaratory and injunctive relief against Defendant Maine

Department of Transportation ("MDOT"). MDOT is the state agency responsible for

maintaining state roads and highways, other than the Maine Turnpike.

Bitumar's Motion seeks an order enjoining and restraining MDOT from implementing

a temporary ban on the use of re-refined engine oil bottoms ("REOB") in the performance-

graded ("PG") asphalt cement (also called asphalt binder) supplied to MDOT's road and

highway paving projects. Effective August 1, 2014, MDOT is requiring all suppliers of PG

binder to MDOT projects to certify that the binder does not contain REOB. According to

MDOT, the ban will continue until MDOT has determined whether to accept asphalt binder

containing REOB for use in its projects.

Bitumar's motion advances two essential arguments: (1) the temporary REOB ban

constitutes an improperly adopted rule because MDOT implemented the ban without

complying with the rule-making provisions of the Maine Administrative Procedure Act

("APA") and (2) MDOT's ban constitutes arbitrary and capricious agency action, because there

is little or no evidence that the use of REOB as an ingredient in asphalt binder has any negative

effect on the quality or durability of asphalt pavement. MDOT responds that (1) the REOB

ban is an interpretation of a Standard Specification, not a rule and (2) MDOT's temporary ban

of REOB is necessary to enable MDOT to determine whether REOB complies with MDOT's

Standard Specifications for MDOT construction projects and whether REOB is a cause of

premature failure of asphalt pavement.

Bitumar's Motion came before the court for a non-testimonial hearing July 30, 2014.

For the reasons discussed below, the court denies Bitumar's motion for a preliminary

injunction.

## I. Procedural History

On July 25, 2014, Bitumar filed a complaint for declaratory and injunctive relief against

MDOT along with the present motion. Bitumar supports its motion with declarations from the

following individuals:

(1) Francis O'Brien, a business advisor and consultant to Bitumar who is "intimately familiar with asphalt production" and who formerly served as the president and chief operating officer of the Hudson Companies—a supplier of asphalt for road paving that entered into an agreement under which Bitumar began managing part of the Hudson Companies in 2013;

(2) John D. D'Angelo, Ph.D., a civil engineer who has published over 57 peer reviewed papers on asphalt materials and construction and was retained to assist in testing and evaluation of the use of REOB as an asphalt binder modifier; and

(3) Mark G. Bouldin, Ph.D., a chemical engineer who is an expert in refining, asphalt, asphalt production, asphalt binder and mixture performance testing, polymers and polymer modification of asphalt, and asphalt binder specifications among others.

This case was accepted for transfer to the this court on July 28, 2014. The following

day, MDOT submitted its opposition to Bitumar's motion. In support of its opposition,

2

MDOT offered the affidavit of Richard Bradbury, P.E., a licensed professional civil engineer in Maine currently serving as the Director of Materials Testing and Exploration for MDOT.

At the July 30, 2014 hearing, Bitumar submitted two additional declarations, two examples of MDOT rules and a Maine Superior Court opinion. The declarations were a supplemental declaration by Mark Bouldin, Ph.D. and Vu Nguyen, a chemical engineer with approximately 20 years of experience in the refining and asphalt industry. At the conclusion of oral argument, the parties agreed to submit the matter for the court's consideration on the arguments and documents discussed above.

The day after the hearing, Bitumar submitted a copy of a decision of the Vermont Superior Court granting Bitumar's application for preliminary injunction against the Vermont Agency of Transportation (VAT) and enjoining VAT from banning the use of REOB in the asphalt supplied to its projects. *See Bitumar USA, Inc. v. Vermont Agency of Trans.*, Vt. Super. Ct., Docket No. 449-7-14 Wncv (July 31, 2014).

## II. Factual Background

Bitumar's parent corporation, Bitumar, Inc., is a Canadian company specializing in the production of material used in asphalt blends for road paving and the roofing industry. Declaration of Francis J. O'Brien ("O'Brien Dec."), ¶ 2. Bitumar supplies material to paving contractors in all New England states. *Id.* In June 2013, Bitumar expanded its business in the New England market when it entered into an agreement with The Hudson Companies. *Id.* at ¶ 3. Together, Bitumar and the Hudson Companies are substantial suppliers of liquid asphalt in New England and produce over 50% of the asphalt used by those paving contractors who do not produce their own asphalt. *Id.* at ¶ 4.

Asphalt pavement is a product of sand and stone aggregate mixed with asphalt cement as a binder. *Id.* at ¶ 5. The asphalt cement that binds the aggregate is derived from the

3

refinement of crude oil. *Id.* Asphalt binder is a by-product of the refinement of crude oil into other products such as gasoline and home heating oil. *Id.* Maine requires that asphalt pavement meet a PG of 64 -28, meaning that it must adequately perform at any temperature between 64 degrees Celsius and negative 28 degrees Celsius. *Id.* at ¶ 6.

In the 1980's, a company called Safety-Kleén developed a product—REOB— derived from the re-refinement of waste engine oil, intended to be added to asphalt binder, in order to improve the performance of the binder. *See id.* at ¶ 8. Not long after that, Bitumar began using REOB in its asphalt binder. *Id.* at ¶ 9. Bitumar describes REOB as an additive or "cutter" to asphalt binder. *See* Declaration of Vu Nguyen at ¶¶ 2-4, Bouldin Supplemental Declaration at ¶ 1-3. REOB has been included in asphalt sold by Bitumar in New England since at least 2005. O'Brien Dec., ¶ 9.

MDOT, however, had no knowledge of REOB potentially being used in the asphalt binder supplied to its paving projects "until recently." Affidavit of Richard Bradbury, P.E. ("Bradbury Aff.") ¶ 15. None of the Quality-Control Plans or Certificates of Analysis that MDOT's Standard Specifications require suppliers of asphalt material to submit in connection with MDOT projects has indicated the presence of REOB in asphalt binder. *See id.* at ¶ 11.

MDOT learned about the use of REOB at a Pavement Summit meeting, at which representatives of the state highway agencies from Maine, New Hampshire, Vermont and Massachusetts gathered to discuss the premature failure of asphalt paving on highways that several of the states had been experiencing. *Id.* at ¶ 9. At a subsequent meeting, representatives of the New England state highway agencies brought up for discussion a published study evaluating REOB. *Id.* The study suggested that the inclusion of REOB as an ingredient in the asphalt binder may have caused premature pavement failures. *Id.* Although the study is not specifically identified by MDOT, Bitumar contends—and MDOT has not

4

disputed—that the aforementioned study was one conducted by Professor Simon Hesp after a pavement failure in Ontario, Canada. *See* O'Brien Dec., ¶ 11. The Hesp study indicated that a high (15-30%) concentration of REOB in asphalt could lead to premature failure of asphalt pavement. *Id.* Bitumar's product uses a lower, 2-8% concentration of REOB. *Id.*

Following the Hesp study, Safety-Kleen commissioned a series of extensive studies and testing by an independent laboratory in Tampa, Florida, a world-wide leader in asphalt analysis and testing, to evaluate REOB and its effect on asphalt. Declaration of Mark G. Bouldin, Ph.D. ("Bouldin Dec."), 3. Based on this work, Dr. D'Angelo and some of his colleagues published a number of papers and presentations. *Id.* at 4. The resulting papers and publications were unable to attest to any adverse effect of REOB even at concentrations far greater than commonly used in standard formulations. *Id.*; O'Brien Dec., ¶ 12.

Around the time of the Pavement Summit, Safety-Kleen approached suppliers of pavement binders in Maine offering to sell them REOB as a lower cost additive for asphalt. Bradbury Aff. ¶ 10. Several suppliers have contacted MDOT to inquire if REOB was acceptable for use on MDOT projects. *Id.* MDOT also met with the Maine Asphalt Pavement Association ("MAPA") to discuss its concerns regarding REOB. *Id.* at ¶ 16. MDOT claims many members of MAPA were unaware that REOB was being added to PG asphalt binder, and that they were concerned that the addition of REOB may negatively affect the performance of asphalt pavement. *Id.*

In an attempt to determine the extent of REOB use in Maine, MDOT contacted its primary paving contractors and several approved asphalt suppliers for Maine highway projects and determined that only Bitumar uses REOB, and that Bitumar's contracts to supply liquid asphalt to MDOT contractors amounted to less than 1% of MDOT's highway paving program. *Id.* at ¶¶ 17-18.

Based on this information, MDOT determined that it "would not place highway projects and the environment at risk without a better understanding of the long term effects of the REOB additive." *Id.* at ¶ 19. To that end, MDOT is participating in a laboratory study underway at the University of Massachusetts with the explicit purpose of determining whether REOB contributes to the early failure of highway pavement. *Id.* at ¶ 20. Although MDOT has not provided a timeline during which these events took place, the record suggests that they all occurred before June 16, 2014.

On June 16, 2014 MDOT issued a letter (the "letter" or "6/16 letter") explaining that it has decided to implement the following requirements:

> <u>Effective immediately</u>, all Lots of PG binder containing [REOB] must be clearly identified on the Certificate of Analysis.
>
> <u>Effective August 1, 2014</u>, all suppliers of PG binder must certify that PG binder supplied for use on Department projects does not contain [REOB].

Exhibit D. to MDOT's Opposition to Bitumar's Motion for Preliminary Injunction ("MDOT's Opp. to Prelim. Inj. Mot.").

The 6/16 letter explains that the requirements were being enacted in response to "documented incidents of premature failure of pavements that were produced with asphalt containing [REOB]" and that the certification that REOB is not being used "will be required until there is sufficient research into the effects of these materials on the long-term performance of asphalt pavements for us to make an informed decision on their suitability as a constituent of asphalt binder." *Id.* Beyond the reference to what Bitumar assumes to be the Hesp study, however, MDOT has not provided specifics regarding the "documented incidents" referenced in the 6/16 letter. *See* O'Brien Dec., ¶¶ 15-20.

MDOT's Opposition to Bitumar's Motion says that MDOT is not able, at least yet, to confirm that REOB complies with MDOT's Standard Specifications for its construction

6

projects. MDOT Opp. to Mot. for Prelim. Inj., 2. MDOT adopted the Standard Specifications pursuant to 23 M.R.S.A. § 4243 (MDOT "may adopt its own standard contract specifications"). The Standard Specifications consist of over 670 pages of general and technical requirements that are referenced in all contracts for construction and maintenance of transportation projects for MDOT. Bradbury Aff., ¶ 6.

Division 700, Section 702.01 of the Specifications requires that "Performance Graded Asphalt Binder shall conform to the requirements of [American Association of State Highway and Transportation Officials] ("AASHTO") M 320. *Id.* at ¶ 11. Specifically, AASHTO M 320 section 5.2 provides that "modifiers may be any organic material of suitable manufacture that is used in virgin or recycled condition and that is dissolved, dispersed, or reacted in asphalt binder to enhance its performance. *Id.* at ¶ 13. AASHTO M 320 section 5.3 requires that asphalt must be homogeneous, free from water and deleterious materials. *Id.* It is whether REOB meets these criteria that MDOT has yet to determine.

Implicit in MDOT's argument is the premise that REOB constitutes a "modifier" for purposes of the AASHTO M 320 standard. *See id.* at ¶ 13. Bitumar disputes that premise, arguing that REOB is a "cutter," not a modifier. *See* Nguyen Dec., ¶¶ 2-4; Supp. Bouldin Dec., ¶¶ 1-3.

After MDOT issued the 6/16 letter, Bitumar and Safety-Kleen met with MDOT representatives to discuss REOB and its use in PG asphalt binder. O'Brien Dec., ¶ 21. At the meeting, MDOT requested that Bitumar and Safety-Kleen provide information about the constituents of REOB and how contaminants and unacceptable additives are removed during the REOB re-refining process. Bradbury Aff., ¶ 14. MDOT requested evidence, such as test results, showing that the inclusion of REOB does not negatively affect pavement durability or

performance. *Id.* As of the July 30 hearing, according to MDOT, Bitumar and Safety-Kleen had not provided MDOT with the requested information.

On July 22, 2014, Bitumar formally demanded that the REOB ban be rescinded or at least stayed. Exhibit 3 to O'Brien Aff. MDOT has not complied with that demand.

*III. Discussion*

Bitumar's request for a preliminary injunction is governed by Maine Rule of Civil Procedure 65(b). In the leading case of *Ingraham v. University of Maine at Orono,* the Law Court held, "Before granting a preliminary injunction, the Court must find that four criteria are met:

 (1) that plaintiff will suffer irreparable injury if the injunction is not granted,

 (2) that such injury outweighs any harm which granting the injunctive relief would inflict on the defendant,

 (3) that plaintiff has exhibited a likelihood of success on the merits (at most, a probability; at least, a substantial possibility), [and]

 (4) that the public interest will not be adversely affected by granting the injunction.

441 A.2d 691, 693 (Me. 1983) (per curiam).

These criteria "are not to be applied woodenly or in isolation from each other; rather, the court of equity should weigh all of these factors together in determining whether injunctive relief is proper in the specific circumstances of each case." *Dept. of Envt'l Prot. v. Emerson,* 563 A.2d 762, 768 (Me. 1989). For example "[c]lear evidence of irreparable injury should result in a less stringent requirement of certainty of victory; greater certainty of victory should result in a less stringent requirement of proof of irreparable injury." *Id.* (quoting *Developments in the Law—Injunctions,* 78 Harv. L. Rev. 994, 1056 (1965)).

A. Likelihood of Success.

A "likelihood of success on the merits" is "at most, a probability; at least, a substantial possibility." *Bangor Historic Track, Inc. v. Dep't of Agric.,* 2003 ME 140, ¶ 9, 837 A.2d 129.

Bitumar argues that its challenge to the MDOT ban is likely to succeed on the merits because (1) the ban is a rule that MDOT adopted without complying with the rule-making procedure of the Maine APA; and (2) the ban is arbitrary, capricious and an abuse of MDOT's discretion because it is not based on sufficient evidence. MDOT responds by arguing that (1) the rulemaking procedure set forth in the APA is inapplicable to the REOB ban because it is not a rule and (2) its ban of REOB in its projects is a reasonable temporary measure designed to give MDOT the opportunity to investigate the suitability of a new (to MDOT) ingredient that has been linked to premature pavement failure and that has not been shown to meet MDOT's Standard Specifications, before that ingredient is used in MDOT's paving projects.

1.  *The REOB Ban is Not a Rule for Purposes of APA's Rulemaking Procedure.*

The APA defines a "Rule" as "the whole or any part of every regulation, standard, code, statement of policy, or other agency guideline or statement of general applicability…that is or is intended to be judicially enforceable and implements, interprets or makes specific the law administered by the agency, or describes the procedures or practices of the agency." 5 M.R.S.A. § 8002(9)(A). A rule is not judicially enforceable unless it is adopted in a manner consistent with [the APA]." 5 M.R.S.A. § 8002(9). MDOT does not dispute that the REOB ban was not adopted in a manner consistent with the APA's rule making process. Instead, MDOT argues the REOB ban is a contractual standard, not a rule. MDOT Mot. for Prelim. Inj., 5-6.

Because the MDOT ban operates only to preclude those who choose to contract with MDOT from supplying asphalt binder with REOB, and does not regulate the use of REOB, the REOB ban is either an interpretation of an existing specification, as MDOT contends, or at best is a new specification, and in either case, is not a rule for purposes of the APA. *See* Bradbury Aff., ¶¶ 12-13.

Maine courts have yet to address whether MDOT's Standard Specifications constitute a rule, but courts in other states have examined the issue in the context of similar statutes and specifications and determined that a state highway agency's contract specifications are not subject to rulemaking requirements. In *Greenfield Constr. Co. v. Mich. Dep't of Transp.*, the Michigan Supreme Court rejected a contractor's claim that the state's "1970 Standard Specifications for Highway Construction" were rules under Michigan's APA because the specifications were "one of hundreds of standard contract terms and specifications governing the contractual relationship between the state and contractors engaged in state highway work." 261 N.W.2d 718, 721-23 (Mich. 1978); *see also Abari Constr. Co. v. Illinois*, 59 Ill. Ct. Cl. 316, 318 (2007) (limitations period in Illinois DOT's Standard Specifications is a contractual term, not an APA rule). In support of its holding, *Greenfield* explained that no part of the specifications "have ever been promulgated as agency rules within the [Michigan APA], as a condition of their validity." *Greenfield* 261 N.W.2d at 722. Similarly, the Alabama Supreme Court in *Ala. Dep't of Transp. v. Blue Ridge Sand & Gravel, Inc.*, rejected an argument analogous to the argument adopted by Bitumar . 718 So.2d 27, 29 (Ala. 1998). In particular, the Alabama DOT interpreted portions of Alabama's "Standard Specifications for Highway Construction" to require hot asphalt mix for roads to have a "bulk specific gravity greater than 2.550" to avoid premature road surface failures as "simply a term that may be incorporated into a contract between the Department and some other party." *Id.* at 29. The court explained that the fact that the Alabama DOT "has established standard specifications that it may incorporate by reference rather than setting forth all specifications in each highway construction contract does not elevate those specifications to the statute of 'rules' [under the Alabama APA]." *Id.*; *see also Dep't of Transp. v. Blackhawk Quarry Co. of Fla.*, 528 So.2d 447, 450 (Fla. App. 1988)

10

(specifications for acceptable material as part "of comprehensive standards for state road and bridge construction" are contract terms, not rules under the APA).[1]

Furthermore, the statutory structure authorizing the Standard Specifications suggests that they are not rules within the meaning of the APA. 23 M.R.S.A. § 4243, *Contracts for construction and maintenance*, authorizes MDOT "to adopt its own standard contract specifications" as part of its "full power in the procurement and letting of all contracts to construct, demolish or maintain transportation infrastructure."

Section 4243 does not require MDOT to promulgate its Standard, Special or Supplemental Specifications through the APA's rulemaking process. *Id.* Title 23, however, does contain several instances where the Legislature has expressly directed MDOT to promulgate rules concerning certain aspects of its transportation regulatory duties under Maine's APA. *See* 23 M.R.S.A. § 704(9) (MDOT to promulgate rules under APA for entrances to highways); 23 M.R.S.A. §704-A(9) (MDOT to promulgate rules under APA for traffic movement permits); 23 M.R.S.A. § 4404 (MDOT to promulgate rules under APA for ferry line tolls).

The contrast between those provisions and section 4243 implies that the Maine Legislature did not intend that MDOT be required to promulgate its Standard Specifications through the APA's rulemaking process. *See Blue Yonder, LLC v. State Tax Assessor*, 2011 ME 49, ¶ 10, 17 A.3d 667 (courts may "not read additional language into a statute"). Accordingly, given that neither the REOB ban nor the Standard Specifications is a "rule" within the meaning of the APA, MDOT was not required to follow the APA rulemaking process in adopting the temporary ban on the use of REOB in its projects.

---

[1] The definition of a rule in the Michigan (Mich. Comp. Laws. § 24.207), Illinois (5 Ill. Compl. Stat. § 100/1-70), Alabama (Ala. Code § 41-22-3(9), and Florida (Fla. Stat. § 120.52(16)) APAs are substantially similar to, if not identical to the definition of a rule in the Maine APA.

11

*2. The REOB Ban is Not Arbitrary, Capricious, or an Abuse of MDOT's Discretion.*

Bitumar's alternative argument is that MDOT's temporary ban on REOB is an arbitrary and capricious agency action and an abuse of discretion that is reviewable under the appeal provisions of the APA. *See* 5 M.R.S.A. § 11001 ("[A]ny person who is aggrieved by final agency action shall be entitled to judicial review thereof in the Superior Court..." ). The court may reverse or modify the agency's final action if it is "[u]nsupported by substantial evidence on the whole record; or [a]rbitrary or capricious or characterized by abuse of discretion." 5 M.R.S.A. § 11007(4)(C)(5)-(6). "Final Agency action" means a decision by an agency which affects the legal rights, duties or privileges of specific persons, which is dispositive of all issues, legal and factual, and for which no further recourse, appeal or review is provided within the agency." 5 M.R.S.A. § 8002(4).

At least at this early stage of the case, the court is prepared to assume that MDOT"s REOB ban, although temporary, constitutes final agency action because it affects Bitumar's legal rights, is dispositive of all issues, and no further recourse is available within MDOT, and also that Bitumar's declaratory judgment action is a proper vehicle by which to challenge the ban.

Consistent with the general rule that the party seeking to overturn government action has the burden of persuasion, see *Seven Islands Land Co. v. Maine Land Use Regulation Comm'n*, 450 A.2d 475, 479 (Me.1982), Bitumar has the burden to show that MDOT acted arbitrarily and capriciously, or abused its discretion in adopting the temporary ban on REOB.

Framing the exact issue before the court is always helpful to analysis, and especially so here, because the parties frame the issue differently. Bitumar sees the issue as whether REOB is or is not a suitable additive or modifier to asphalt binder, and asks that the court determine that issue by enjoining MDOT from refusing to accept REOB until it has made its own

12

determination. MDOT says the issue is whether it should be allowed to investigate REOB and its suitability for MDOT projects before being required to use REOB in its projects.

Because the MDOT ban is temporary, and because MDOT is actively investigating REOB, and in fact is waiting for information on REOB from Bitumar and Safety-Kleen, the court agrees with MDOT's framing of the exact issue raised by Bitumar's Motion. The exact issue is whether Bitumar has shown a likelihood of success on its claim that MDOT has acted arbitrarily and capriciously in deciding to ban REOB at least until MDOT has determined that REOB is both consistent with MDOT's Standard Specifications and will not contribute to premature pavement failure.

Bitumar's arguments mostly go to the ultimate issue, not to the issue as just defined. Bitumar says the REOB ban is not based on competent evidence and is contrary to all of the empirical evidence showing the strong performance of asphalt made with REOB. Bitumar Mot. for Prelim. Inj., 8-9.[2]

It may be that MDOT will agree to accept REOB in its asphalt binder once it has evaluated the evidence marshaled by Bitumar. If the Hesp study indeed forms part of the basis for MDOT's concern about REOB, it may be that MDOT will come to agree with Bitumar that the level of REOB in Bitumar's product should not be equated to the level of REOB in the pavement involved in the Hesp study. However, even Bitumar's characterization of the Hesp study indicates that the study's conclusions link REOB to premature failure of asphalt

---

[2] According to Bitumar, MDOT has failed to identify a single scientific reason for the ban. Bitumar Mot. for Prelim. Inj., 9. The one study that the New England state highway agencies have apparently relied upon is the Hesp Study. *Id.* at 9-10. Bitumar argues that the Hesp study, which suggested a 15-30% concentration of REOB in asphalt could lead to premature failure of asphalt pavement is inapposite because Bitumar only uses a 2-8% concentration of REOB. O'Brien Decl., ¶ 11. Furthermore, Bitumar's REOB supplier, Safety-Kleen commissioned a series of extensive studies and testing by an independent laboratory in Tampa, Florida, a world-wide leader in asphalt analysis and testing, to evaluate REOB and its effect on asphalt. *Id.* at ¶ 12. These studies allegedly showed no adverse effect on the durability or longevity of asphalt pavement with REOB and, to the contrary, found REOB improved asphalt performance in many instances. *Id.* at ¶¶ 14, 1.

13

pavement. That linkage and the observed but thus far unexplained premature failure of asphalt pavement discussed at the Pavement Summit meeting, taken together, clearly justify further investigation of REOB, and furnish a rational basis for MDOT's desire to investigate REOB before agreeing to use it.

Moreover, the risk of premature pavement failure is not MDOT's sole concern. MDOT's decision to ban REOB temporarily was based also on lack of sufficient information to determine whether REOB complies with the AASHTO M 320 standard for modifiers of asphalt binder. MDOT Opp. to Mot. for Prelim. Inj., 10. Bitumar's response that REOB is an additive, not a "modifier," for purposes of AASHTO M 320, seems nuanced at best. Whatever label is applied to the use of REOB in asphalt binder, MDOT's desire to investigate whether REOB is suitable before agreeing to accept it as an ingredient in asphalt binder is reasonable. In that regard, MDOT has invited Bitumar and Safety-Kleen to support their contentions about REOB with concrete information, so to speak, about how REOB is made and what is in it, and has yet to receive that information. *Id.* at 11.

The core issue raised by Plaintiff's Motion is, indeed, whether MDOT should have a reasonable opportunity to investigate the suitability of REOB as an ingredient in asphalt binder before being compelled to accept it. However long REOB has been in use by Bitumar, it is apparently a new and unfamiliar ingredient to MDOT and, according to the Bradbury affidavit, MDOT's counterpart agencies in other New England states. Bitumar's argument assumes that MDOT should have the burden to prove that REOB is inconsistent with MDOT's Standard Specifications, but it seems no less logical to put the burden on Bitumar to justify its claim that REOB meets the specifications and will not lead to premature pavement failure. That justification is exactly what MDOT is seeking, and has already requested from Bitumar.

14

As MDOT has pointed out, the Maine Legislature has directed it to provide safe, efficient, and effective roads. 23 M.R.S.A. § 4206(1)(A). The temporary nature of MDOT's ban and MDOT's intention of investigating the suitability of REOB render the ban a reasonable response to a founded concern about REOB's compliance with MDOT's specifications and its effect on durability and performance of the asphalt in which it us used. For these reasons, Bitumar has not met the likelihood of success criterion in terms of showing that MDOT's temporary ban is potentially or likely liable to be overturned as an arbitrary or capricious agency decision or an abuse of discretion.

B.      Irreparable Injury to Bitumar.

Bitumar argues that its reputation and business will suffer irreparable injury if the REOB ban is not enjoined. Bitumar Mot. for Prelim. Inj., 10. The REOB ban could prevent Bitumar from satisfying its clients' existing needs for this year's road paving season, or at least make it more costly. *Id.* Bitumar may not be able to recoup these costs due to MDOT's sovereign immunity. Bitumar also fears that its clients will find new suppliers and would be unlikely to work with Bitumar in the future. *Id.* Finally, Bitumar points to the cost the ban will impose on it to move its inventory out of storage facilities where the mixture is not banned and re-supply the storage tanks in New England with new product containing different additives. *Id.* at 11.

MDOT claims that the harm Bitumar alleges is not the result of any retraction of approval of REOB by MDOT, since no such approval ever existed. MDOT Opp. to Mot. for Prelim. Inj. 12. MDOT also argues Bitumar has not presented concrete evidence of damages it will incur as a result of the REOB ban and that Bitumar has not established MDOT is entitled to sovereign immunity. *Id.* at 13. Finally, MDOT argues any damages Bitumar faces are the

15

result of business decisions without any reliance on the viability of REOB in MDOT paving projects.

On this record, Bitumar has met the irreparable harm criterion, although the extent of harm is limited.

## C.     Balance of Harms Criterion

The irreparable injury Bitumar faces is real, but limited. Bitumar had contracts with paving contractors to supply liquid asphalt that amounted to less than 1% of MDOT's highway paving program. Bradbury Aff. ¶ 18. The potential harm to MDOT and the users of the roads and highways maintained by MDOT is less certain, because the evidence linking REOB to premature pavement failure is mixed. However, if the risk about which MDOT is concerned materializes, the resulting harm would vastly outweigh the harm to Bitumar. Accordingly, the court deems the balance of harms criterion to be in equipoise between the parties.

## E.     Public Interest.

MDOT contends that the public interest favors its position, in that MDOT should be able to verify the suitability of the materials furnished to pave the public roads and highways for which MDOT is responsible. MDOT Opp. to Mot. for Prelim. Inj., 15-16. Bitumar counters that enjoining the REOB ban will not harm the public interest because the risks that concern MDOT are unsubstantiated in evidence. Bitumar Mot. for Prelim. Inj., 11-12. Bitumar also argues that allowing the REOB ban to stand could prevent many paving contractors from fulfilling their contractual obligations, delaying paving jobs, and putting workers temporarily out of work or causing lay offs. *Id.*

MDOT also makes a separation of powers argument that has some merit. This court is obviously vested with authority to review and, if appropriate, enjoin action by MDOT. If this case were in the posture of MDOT having completed its investigation of REOB and

16

determined to ban its use in MDOT projects permanently, there would be no real separation of powers issue. Reviewing and, if appropriate, overturning agency decisions and enjoining agency action are steps that courts can and do take in the ordinary course of exercising jurisdiction. However, when the court is asked to adjudicate an issue over which MDOT has at least primary jurisdiction before MDOT has had a reasonable opportunity to adjudicate the issue itself, the issue of separation of powers is raised more substantially. Bitumar would have the court adjudicate the suitability of REOB for MDOT projects and, at least in effect, require MDOT to accept it. Thus, this is a case in which the court is being asked to do much more than to overturn an administrative agency decision. The court is being asked, not just to take away the agency's decision, but to take away the agency's decision making process as well. On this record, there is not a sufficient reason—in terms of unwarranted footdragging or other undue delay on MDOT's part—to justify that level of intrusion by the court into a decision making process allocated by law to MDOT.

On balance, the court is persuaded that the public interest favors denying injunctive relief. MDOT's concerns about REOB have a reasonable basis, as discussed above. Also, the potential adverse economic effect of the ban on paving contractors and their employees appears limited to Bitumar 's 1% of MDOT's highway paving. The public interest criterion weighs against granting injunctive relief.

*IV. Conclusion*

In this instance, the likelihood of success and public interest factors weigh against the grant of injunctive relief, and Bitumar's showing of irreparable harm is not compelling. The

17

court concludes that Bitumar has not made the requisite showing that it is entitled to the injunctive relief it seeks.[3]

The entry will be: Bitumar's Emergency Motion for Preliminary Injunction is denied.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated: August 1, 2014

_____
A.M. Horton
Justice, Business & Consumer Court

---

[3] It needs to be acknowledged that this decision departs from that of the Vermont Superior Court in *Bitumar USA, Inc. v. Vermont Agency of Trans.*, Vt. Super. Ct., Docket No. 449-7-14 Wncv (July 31, 2014). A significant distinguishing consideration is that the Vermont Agency of Transportation (VAT) evidently gave specific approval to Bitumar's product in 2014, after receiving samples and a quality control report from Bitumar, and that Bitumar expects to sell $7 million worth of product containing REOB to VAT's paving contractors this year. *Id.* Nothing comparable has been presented in this case. Another difference is that the Vermont decision appears to attach no significance to the fact that Bitumar failed to disclose to VAT that its product included REOB. *Id.* at 3 n.2. This court has a different view. In this case, the fact--undisputed on this record—that the MDOT had no knowledge until recently that REOB might be included in the asphalt binder used in the pavement supplied to it makes all the difference. Were it shown that MDOT had a practice of knowingly accepting asphalt binder with REOB, its claim of needing to impose a temporary ban in order to investigate REOB might have fared differently in this order.

Entered on the Docket: 8-1-14
Copies sent via Mail ___ Electronically ✓

**Bitumar USA, Inc. v. Maine Department of Transportation**
**BCD-CV-14-50**


**Bitumar USA, Inc.**
  **Petitioner / Plaintiff**

  Counsel:                    John Aromando, Esq.
                             Merrills Warf 254 Commercial St
                             Portland, ME 04101




**Maine Department of Transpostation**
  **Respondents / Defendants**

  Counsel:                    Rebecca Farnum, Esq.
                             Three Canal Plaza
                             PO Box 4630
                             Portland, ME 04112-4630